1    Fredric D. Woocher (SBN 96689)
     Michael J. Strumwasser (SBN 58413)
2    STRUMWASSER & WOOCHER LLP
     100 Wilshire Boulevard, Suite 1900
3    Santa Monica, California 90401
     Telephone:    (310) 576-1233
4    Facsimile:     (310) 319-0156
     E-mail: fwoocher@strumwooch.com
5

6    J. William Yeates (SBN 84343)
     Keith G. Wagner (SBN 210042)
7    Jason R. Flanders (SBN 238007)
     LAW OFFICE OF J. WILLIAM YEATES
8    3400 Cottage Way, Suite K
     Sacramento, CA 95825
9    Telephone:    (916) 609-5000
     Facsimile:     (916) 609-5001
10   E-mail: byeates@enviroqualitylaw.com

11
     Attorneys for Plaintiffs William Melendez et al.
12

13                           UNITED STATES DISTRICT COURT

14                      NORTHERN DISTRICT OF CALIFORNIA

15

| | |
|---|---|
| 16   WILLIAM MELENDEZ, KEN GRAY, JYL LUTES, CAROLYN ANDERSON, and LANDWATCH MONTEREY COUNTY, | CASE NO. C 06-1730 JW |
|                  Plaintiffs, | PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION, OR ALTERNATIVELY FOR REMAND |
|      v. | |
| BOARD OF SUPERVISORS OF THE COUNTY OF MONTEREY; TONY ANCHUNDO, in his capacity as MONTEREY COUNTY REGISTRAR OF VOTERS; COUNTY OF MONTEREY; and DOES 1 through 10, inclusive, | Judge: Hon. James Ware<br>Dept: 8<br>Date:<br>Time: |
|                  Defendants. | |

1

**CONTENTS**

2    TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

3    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4    STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6
     I.    PLAINTIFFS SATISFY THE ESTABLISHED STANDARDS FOR PRELIMINARY
7          INJUNCTIVE RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8                A.    Plaintiffs Are Likely to Succeed on the Merits  . . . . . . . . . . . . . . . . . . . . . . . . 6

9                1.    The Board of Supervisors Has a Ministerial Duty to Submit Plaintiffs' Duly
                       Certified Initiative to a Vote of the People.  If the Board Believes the Initiative to
10                     Be Invalid, It Must First Schedule the Required Election on the Initiative and Then
11                     File Suit Seeking to Have the Initiative Removed from the Ballot . . . . . . . . . . . . . . . 6

12               2.    No Court Has Held That the Federal Voting Rights Act Requires Plaintiffs'
                       Privately Circulated Initiative Petitions to Be Printed in Spanish.  In Fact, the
13                     Courts of Appeals in Two Circuits Have Specifically Rejected Such an Argument
14                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15               B.    The Balance of Hardships Weighs Entirely in Plaintiffs' Favor . . . . . . . . . . . . . . . . 20

16   II.   ALTERNATIVELY, AFTER ISSUING THE REQUESTED TEMPORARY
           RESTRAINING ORDER, THIS ACTION SHOULD BE REMANDED TO STATE
17         COURT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18

19

20

21

22

23

24

25

26

27

28

i

**TABLE OF AUTHORITIES**

**Federal Cases**

*Alonzo v. City of Corpus Christi*, 68 F.3d 944 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Associated General Contractors of Calif. v. Coalition for Economic Equity*,
     950 F.2d 1401 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Austin v. City of Bisbee, Arizona*, 855 F.2d 1429 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . 19, 20

*Big Country Foods, Inc. v. Board of Education*, 868 F.2d 1085 (9th Cir. 1989) . . . . . . . . . . . . 6

*Cate v. Oldham,* 707 F.2d 1176 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*City and County of San Francisco v. Civil Service Commission of the City
     and County of San Francisco*, No. 02-03462, 2002 WL 1677711
     (N.D. Cal. July 24, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Delgado v. Smith,* 861 F.2d 1489 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Detroit Police Lieutenants and Sergeants Ass'n v. City of Detroit*,
     597 F.2d 566 (6th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Elrod v. Burns,* 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Fund for Animals v. Lujan,* 962 F.2d 1391 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir. 1994) . . 21

*Gaus v. Miles, Inc.*, 980 F.2d 564 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Iowa Right to Life Committee, Inc. v. Williams,* 187 F.3d 963 (8th Cir. 1999) . . . . . . . . . . . . . 21

*Lopez v. Monterey County,* 525 U.S. 266 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Montero v. Meyer,* 861 F.2d 603 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Padilla v. Lever*, 429 F.3d 910 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15, 18, 19

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . 21

*San Diego Committee v. Governing Board,* 790 F.2d 1471 (9th Cir. 1986) . . . . . . . . . . . . . . . 21

*Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832 (9th Cir. 2001) . . . . . . . . 6

ii

**State Cases**

*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123 . . . . . . . . . . . 16

*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 . . . . . . . . . . . . . . . . . . . . . . . . 9

*Baroldi v. Denni* (1961) 197 Cal.App.2d 472 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Billig v. Voges* (1990) 223 Cal.App.3d 962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Citizens Against a New Jail v. Board of Supervisors* (1977) 63 Cal.App.3d 559 . . . . . . . . . . . 10

*Citizens for Responsible Behavior v. Superior Court* (1991) 1 Cal.App.4th 1013 . . . . . . . . . . 9

*Costa v. Superior Court* (2006) 39 Cal.Rptr.3d 470 [128 P.3d 675] . . . . . . . . . . . . . . . . . . . . . 22

*deBottari v. Norco City Council* (1985) 171 Cal.App.3d 1204 . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Duran v. Cassidy* (1972) 28 Cal.App.3d 574 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Farley v. Healey* (1967) 67 Cal.2d 325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Gage v. Jordan* (1944) 23 Cal.2d 794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*Gayle v. Hamm* (1972) 25 Cal.App.3d 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Goodenough v. Superior Court* (1971) 18 Cal.App.3d 692 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ley v. Dominguez* (1931) 212 Cal. 587 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*MHC Financing Limited Partnership Two v. City of Santee*
(2005) 125 Cal.App.4th 1372 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Martin v. Board of Trustees of Menlo Park* (1929) 96 Cal.App. 705 . . . . . . . . . . . . . . . . . . . . 10

*Memorial Hospitals Ass'n v. Randol* (1995) 38 Cal.App.4th 1300 . . . . . . . . . . . . . . . . . . . . . 12

*Mervynne v. Acker* (1961) 189 Cal.App.2d 558 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Native American Sacred Site & Environmental Protection Ass'n v.*
*City of San Juan Capistrano* (2004) 120 Cal.App.4th 961 . . . . . . . . . . . . . . . . . 1, 10, 13

*Ratto v. Board of Trustees* (1925) 75 Cal.App. 724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Save Stanislaus Area Farm Economy v. Board of Supervisors*
(1993) 13 Cal.App.4th 141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 8, 9, 12

*Schmitz v. Younger* (1978) 21 Cal.3d 90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Docketed Cases**

iii

*City and County of San Francisco v. Civil Service Commission of the City
    and County of San Francisco*, No. 02-03462, 2002 WL 1677711
    (N.D. Cal. July 24, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Madrigal v. County of Monterey* (No. C06-01407 (RS)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Federal Statutes**

28 C.F.R. § 51.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 U.S.C. § 1443 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 1443(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 1973aa-1a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1973aa-1a(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**State Statutes**

Cal. Elec. Code,

    § 1405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    § 9100 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    § 9103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 9118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

    § 11042(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    § 11042(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iv

**INTRODUCTION**

This is a very simple case, governed by an incontrovertible legal principle: Once an initiative petition is certified as having been signed by the requisite number of voters to qualify for the ballot, the local legislative body has a ***mandatory and ministerial obligation*** to call for an election on the initiative.

In this case, Monterey County Registrar of Voters Tony Anchundo certified to the Monterey County Board of Supervisors that the General Plan Amendment Initiative petition sponsored by Plaintiffs William Melendez et al. had been signed by 12,587 registered voters of the county — almost 50% more than the number necessary to qualify the initiative for the ballot. Yet in ***clear defiance of the law*** and ***ignoring the advice of its own County Counsel***, a bare three-to-two majority of the Board of Supervisors has refused to submit the Initiative to the voters.

As the California Court of Appeal recently held, "[v]oter action by initiative is so fundamental that it is described 'not as a right granted the people, but as a power reserved by them.'" *Native American Sacred Site & Environmental Protection Ass'n v. City of San Juan Capistrano* (2004) 120 Cal.App.4th 961, 965 (citation omitted). By refusing to place the duly certified Initiative on the ballot, the Board of Supervisors has hijacked the democratic process in Monterey County and has nullified the rights of the thousands of voters who signed the Initiative petition and the tens of thousands more who support the proposed general plan amendment. This Court cannot let the Board majority so cavalierly deny its citizens their constitutional rights. In order to protect the people's reserved initiative power, this Court must issue a TRO and OSC Re: Preliminary Injunction commanding the Board of Supervisors to fulfill its ministerial obligation under the law by submitting the Initiative to a vote of the people at the upcoming June 6, 2006, statewide primary election.

Mindful that the right of initiative is "one of the most precious rights of our democratic process" and that "it has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled," *Mervynne v. Acker* (1961) 189 Cal.App.2d 558, 563, California courts have emphasized the need to have initiative and referendum measures "reach the ballot without delay or excessive expenditures of time, money and effort." *Gage v. Jordan* (1944) 23 Cal.2d 794, 799. ***Time is therefore of the essence in this matter***. The Board of Supervisors majority, which has made no secret of its hostility to the proposed Initiative, apparently fears the outcome of the vote

1

1  on Plaintiffs' measure and hopes to gain a strategic advantage by delaying the election until the Board can

2  complete its own overhaul of the outdated County General Plan — an on-again, off-again effort that is now

3  six years in the making.  The Board has no right, however, to interfere with the people's precious initiative

4  right.  As the Court of Appeal held in *Save Stanislaus Area Farm Economy v. Board of Supervisors*

5  ("*Save Stanislaus*") (1993) 13 Cal.App.4th 141, 149, a case that is directly on point:

6          "The law is clear:  A local government is not empowered to refuse to place a duly certified

7          initiative on the ballot."

8          This Court must therefore follow established state-law precedent and issue the requested injunction

9  requiring the Board of Supervisors and Registrar of Voters Tony Anchundo to submit the General Plan

10  Amendment Initiative to the voters at the June 6, 2006, primary election, so that Plaintiffs and the thousands

11  of other Monterey County voters who signed the initiative petition can exercise their constitutional right to

12  vote on an issue of great importance to their community.

13                          **STATEMENT OF FACTS**

14          Plaintiffs Melendez, Gray, Lutes, and Anderson are the proponents of a proposed countywide

15  initiative measure entitled "The Monterey County Quality of Life, Affordable Housing, and Voter Control

16  Initiative" (the "General Plan Amendment Initiative" or the "Initiative"), which proposes to amend Monterey

17  County's outdated General Plan to provide better management of the future growth and development of

18  the county.  The Initiative would enact new General Plan policies that seek to reduce or eliminate the

19  economic, social, and environmental problems caused by rapid, sprawling rural developments and thereby

20  enhance the quality of life of all Monterey County residents.  Among the specific amendments proposed

21  by the Initiative are policies that would direct future development into Monterey County's cities and into

22  five designated "community areas," policies that would increase affordable housing opportunities for

23  working families in the county, policies that would require new development to be phased so that the

24  necessary public infrastructure is completed prior to or concurrent with the new development, policies that

25  help to preserve prime agricultural land, and policies that require voter approval of major development

26  projects that are proposed to be located outside cities and the designated community areas.

27          On October 19, 2005, Plaintiffs commenced the process of qualifying their proposed initiative for

28  the ballot by filing with Defendant Registrar of Voters Tony Anchundo a Notice of Intention to circulate

                                        2

the petition, together with the written text of the proposed measure and a request for preparation of a ballot title and summary pursuant to Elections Code section 9103.[1]  As called for by section 9105, County Counsel prepared a ballot title and summary for the measure, giving it the title, "Amendment of the Monterey County General Plan, Including the North County Land Use Plan."

After receiving the ballot title and summary from the Registrar of Voters and publishing it and the Notice of Intention in a newspaper of general circulation, as required by section 9105, subdivision (b), Plaintiffs began to circulate the initiative petition among the voters of Monterey County.  Although section 9110 provides that an initiative's proponents may take up to 180 days from the date they receive the title and summary to gather the number of signatures necessary to qualify the measure for the ballot, the General Plan Amendment Initiative was immensely popular with the voters, and Plaintiffs needed barely a month to obtain the necessary signatures for their proposed measure.

On December 12, 2005, Plaintiffs filed with the Registrar of Voters 202 petition sections, containing a total of 15,475 signatures, in support of the General Plan Amendment Initiative.  In order to qualify for the ballot, Plaintiffs only needed to submit valid signatures of 8,697 registered voters in Monterey County, representing ten percent (10%) of the total number of votes cast in the county for all candidates for governor in the most recent gubernatorial election.

On January 26, 2006, Registrar of Voters Anchundo completed his verification of the signatures on the initiative petition pursuant to section 9114 and certified that the petition had been signed by 12,587 registered voters in the County of Monterey — almost 50% more than the number needed to qualify the Initiative for the ballot.  *See* Verified Petition for Writ of Mandate and Complaint for Injunctive and Declaratory Relief ("Verified Petition"), Exh. A.  In accordance with section 9114, the Registrar of Voters certified the results of his examination to Defendant Monterey County Board of Supervisors at its next regularly scheduled meeting on January 31, 2006.

Under section 9118, upon receipt of the Registrar's certification that an initiative petition has been signed by the requisite number of voters and qualifies for the ballot, "the board of supervisors *shall do* one of the following":  (a) adopt the initiative without alteration; (b) submit the initiative to the voters at the next

---

[1] Unless otherwise indicated, all further statutory references are to the California Elections Code.

3

statewide election occurring at least 88 days thereafter; or (c) order a report to be prepared pursuant to section 9111 on the potential impact of the initiative, following the receipt of which the board then has to either adopt the initiative or submit it to a vote of the people.[2]  At the January 31, 2006, meeting, the Board of Supervisors chose the third option, ordering that reports be prepared on the Initiative's fiscal impact and consistency with the planning and zoning laws, and directing that the reports be completed and presented to the Board for consideration at its February 28, 2006, meeting.

Upon receiving the requested reports at the February 28 meeting, the Board of Supervisors was thus required under section 9118, subdivision (c), either to adopt the proposed measure within 10 days or to order that it be submitted to the voters of the County at the June 6, 2006, statewide primary election — i.e., at the next statewide election occurring not less than 88 days thereafter, in accordance with section 1405, subdivision (b).[3]  That the Board was *legally required* to take one of these two actions was *repeatedly confirmed* in County Counsel's Staff Report presented to the Board in connection with its consideration of this matter.  *See* Declaration of Fredric Woocher in Support of Ex Parte Application for TRO and OSC Re: Preliminary Injunction ("Woocher Decl."), Exh. 3, p. 1 ("*Pursuant to law*, the Board

---

[2]Elections Code section 9118 provides, in full:

"If the initiative petition is signed by voters not less in number than 10 percent of the entire vote cast in the county for all candidates for Governor at the last gubernatorial election preceding the publication of the notice of intention to circulate an initiative petition, the board of supervisors shall do one of the following:

"(a)  Adopt the ordinance without alteration at the regular meeting at which the certification of the petition is presented, or within 10 days after it is presented.

"(b)  Submit the ordinance, without alteration, to the voters pursuant to subdivision (b) of Section 1405, unless the ordinance petitioned for is required to be, or for some reason is, submitted to the voters at a special election pursuant to subdivision (a) of Section 1405.

"(c)  Order a report pursuant to Section 9111 at the regular meeting at which the certification of the petition is presented.  When the report is presented to the board of supervisors, it shall either adopt the ordinance within 10 days or order an election pursuant to subdivision (b)."

[3]Elections Code section 1405, subdivision (b), states in pertinent part:

"(b) The election for a county initiative that qualifies pursuant to Section 9118 shall be held at the next statewide election occurring not less than 88 days after the date of the order of election."

*must* either (1) adopt the initiative measure without alteration or (2) submit the initiative measure without alteration to the voters . . . ."); *id.*, p. 2 ("The Board now has two options with respect to the initiative petition . . . ."); *id.*, p. 3, ¶ E ("Pursuant to Elections Code section 9118, if the Board does not adopt the initiative measure without alteration . . ., *the Board must submit the initiative measure without alteration to the voters* at the next regularly-scheduled statewide election . . . ."). Indeed, Assistant County Counsel Leroy Blankenship specifically warned that the Board could not lawfully refuse to place the General Plan Amendment Initiative on the ballot based upon allegations that it contained legal flaws. As he accurately predicted, "If we said we were not going to place it on the ballot, we are going to be in court the next day. The Board of Supervisors doesn't have the discretion to say we aren't going to put it on the ballot . . . ." (See Woocher Decl., Exh. 4.)

Yet, in flagrant violation of its legal obligation, that is exactly what the Board of Supervisors did. The Board not only refused to take action at its February 28 meeting either to adopt the Initiative or to place it on the June primary ballot as required by section 9118, but by a three-to-two vote, the Board adopted a motion *expressly refusing* to submit the Initiative to the voters. The very next day, on March 1, 2006, Plaintiffs filed the instant lawsuit in Monterey County Superior Court seeking issuance of an order compelling the Board of Supervisors to comply with its ministerial obligation to place the General Plan Amendment Initiative on the June 6, 2006, ballot. On March 7, the Superior Court ordered an expedited hearing on Plaintiffs' complaint, setting a hearing for March 16. *See* Woocher Decl., Exh. 1. However, shortly after receiving notice of the Superior Court's order, Defendants filed a Notice of Removal to this Court, suddenly claiming that "[o]ne of the primary reasons that Defendants declined to place this measure on the ballot was because . . . the measure apparently violates provisions of Section 203 (42 U.S.C. § 1973aa-1a) Federal Voting Rights Act of 1965 ('FVRA'), which requires that 'other materials or information relating to the electoral process' be translated into Spanish in Monterey County." Notice of Removal, ¶ 4.

# ARGUMENT

## I.   PLAINTIFFS SATISFY THE ESTABLISHED STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

The standards for obtaining injunctive relief under Rule 65 are well-established in this Circuit. A

5

request for injunctive relief should be granted if the moving party establishes either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 839-40 (9th Cir. 2001). These formulations are not "different tests, but represent two points on a sliding scale in which the degree of irreparable harm increases as likelihood of success on the merits decreases." *Associated Gen. Contractors of Calif. v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991), *quoting Big Country Foods, Inc. v. Board of Education*, 868 F.2d 1085, 1088 (9th Cir. 1989). As discussed below, Plaintiffs readily satisfy the standards for injunctive relief pursuant to Rule 65.

### A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

**1.   The Board of Supervisors Has a Ministerial Duty to Submit Plaintiffs' Duly Certified Initiative to a Vote of the People. If the Board Believes the Initiative to Be Invalid, It Must First Schedule the Required Election on the Initiative and Then File Suit Seeking to Have the Initiative Removed from the Ballot.**

Almost from the time that the California Constitution was first amended to provide for the initiative and referendum, the courts have repeatedly held that the elected officials against whom those rights are exercised have no authority to interfere with that process, but instead have a ministerial duty to place a qualified initiative on the ballot for a vote of the people. In particular, the courts have stressed that these officials may not unilaterally arrogate to themselves the *judicial function* of determining whether a proposed measure is valid or invalid. Rather, the *only* proper means for a legislative body to challenge the legality of an initiative is to first *schedule the election as required by law* and then, if it deems such action appropriate, seek a court order *removing* the measure from the ballot.

Any conceivable doubt that the Elections Code imposes a ***mandatory duty*** on the Board of Supervisors, enforceable by injunctive relief, to place a duly certified initiative on the ballot notwithstanding any purported "questions" about the initiative's validity were laid to rest in *Save Stanislaus, supra — a case that could not be more on point*. In *Save Stanislaus*, the proponents of a slow-growth initiative proposing to amend the County General Plan had gathered a sufficient number of signatures to qualify their measure for the ballot, but the Board of Supervisors refused to call an election on the initiative, contending

6

1    that it was legally invalid.  The initiative proponents filed a petition for writ of mandate, and the trial court

2    — finding that the Board had not made "a compelling showing that the initiative was clearly invalid as a

3    matter of law," 13 Cal.App.4th at 146 — ordered the measure placed on the ballot.

4         Opponents of the initiative (Family Farm Alliance, or FFA) appealed, and although the case had

5    technically become moot because the initiative was defeated by a wide margin in the intervening election,

6    the Court of Appeal insisted upon deciding the case and issuing an opinion under the public-

7    interest/likelihood-of-repetition exception to the mootness doctrine, explaining:

8         "In the present case, the primary issue is whether the Board illegally usurped a judicial

9         function in refusing to place the initiative on the ballot.  Such action by local government

10        could be timed in such a way as to render the government's conduct unreviewable . . . .

11        Since initiative and referendum matters frequently follow in response to unpopular action

12        or inaction by the local government, the potential for misuse of power by a governmental

13        body strongly influences our exercise of discretion to review this case on the merits."  *Id.*,

14        at 148.

15        Turning to the merits, the Court of Appeal then *emphatically rejected* any suggestion that the

16   Board of Supervisors had the power to review the initiative's validity and unilaterally determine whether

17   to place the matter on the ballot:

18        "FFA and the Board fail to cite a single authority which stands for the proposition

19        that local governments are empowered to exercise discretion in deciding whether to place

20        a duly certified initiative on the ballot.  Such a contention is contrary to established case

21        law.  ***As courts have stated repeatedly and clearly, local governments have the***

22        ***purely ministerial duty to place duly certified initiatives on the ballot***.

23        "The courts have uniformly condemned local governments when these legislative

24        bodies have refused to place duly qualified initiatives on the ballot.  'Given compliance with

25        the formal requirements for submitting an initiative, the registrar must place it on the ballot

26        unless he is directed to do otherwise by a court on a compelling showing that a proper

27        case has been established for interfering with the initiative power.'  (*Farley v. Healey*

28        (1967) 67 Cal.2d 325, 327.)

7

1   "....

2      "FFA and the Board assert that because courts in [some] cases in fact have gone

3   forward with an analysis of the initiatives after condemning the local government's actions,

4   there is now a judicial recognition that legislative review is permissible, and judicial review

5   is merely used to determine whether the local government is right or wrong.

6      "***Not so.  The law is clear:  A local government is not empowered to refuse***

7   ***to place a duly certified initiative on the ballot.***"

8      "What should a local government do if it believes an initiative measure is unlawful

9   and should not be presented to the voters?  A governmental body, or any person or entity

10   with standing, may file a petition for writ of mandate, seeking a court order removing the

11   initiative measure from the ballot.  ***But such entity or person may not unilaterally***

12   ***decide to prevent a duly qualified initiative from being presented to the***

13   ***electorate.***"  *Save Stanislaus*, 13 Cal.App.4th at 148-49 (emphases added; citations

14   omitted).

15      The holding of the Court of Appeal in *Save Stanislaus* thus could not have been more forceful, and

16   it is directly — indeed, uncannily — applicable to this case:  The Monterey County Board of Supervisors

17   simply had no legal authority to refuse to place Plaintiffs' certified initiative measure on the ballot.[4]  If the

18   Board majority truly believed that the General Plan Amendment Initiative suffered from legal flaws and the

19   Board was not merely using those claims as a pretext to mask its own objections to the proposed measure,

20   then the Board should have first scheduled an election on the Initiative as required by law, and then filed

21   suit seeking to remove it from the ballot.

22      As the Court of Appeal observed in *Save Stanislaus*, its decision was by no means the first — nor

23   would it be the last — to hold that a local legislative body has a *ministerial duty* to call for an election on

24

25   ――――――――――――

26      [4]As noted in the decision, the Court of Appeal in *Save Stanislaus* issued its published opinion
specifically in order to provide guidance once and for all to trial courts that might be confronted, as here,
27   by a local government's "misuse of power" in refusing to place a qualified initiative on the ballot.  Under
the doctrine of *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, California trial
28   courts are duty-bound to follow the Court of Appeal's directive and to issue a writ of mandate or injunction
compelling the Board to place Plaintiffs' initiative on the ballot without further delay.

8

a duly certified initiative petition, and to condemn the body for refusing to do so.[5]  Indeed, the principle that government officials have the ministerial duty to certify and to submit qualified ballot measures to a vote of the electorate *has been settled law in California for more than 75 years*, and it has been affirmed and re-affirmed by the courts time and again, in a variety of contexts.  Some of the many cases reiterating this principle include:

• *Schmitz v. Younger* (1978) 21 Cal.3d 90, 92-93:  "The duty of the Attorney General to prepare title and summary for a proposed initiative measure is a ministerial one and mandate will lie to compel him to act when the proposal is in proper form and complies with statutory and constitutional procedural requirements."

• *Farley v. Healey* (1967) 67 Cal.2d 325, 327:  "The right to propose initiative measures cannot properly be impeded by a decision of a ministerial officer, even if supported by the advice of the city attorney, that the subject is not appropriate for submission to the voters."

• *Native American Sacred Site & Environmental Protection Ass'n, supra*, 120 Cal.App.4th at 966:  "A city's duty to adopt a qualified voter-sponsored initiative, or place it on the ballot, is ministerial and mandatory.  This duty remains, even where the performance is beyond the statutory time frame."

• *deBottari v. Norco City Council* (1985) 171 Cal.App.3d 1204, 1208-09:  "[M]any courts have construed similar election statutes to hold that a city clerk, a city registrar of voters, a county clerk, a county board of supervisors, and the Secretary of State of California all have a mandatory

---

[5]The Court in *Save Stanislaus* referred to three earlier appellate decisions in which the courts, while reaffirming that local election officials and governing bodies had no authority to "usurp the judicial power" by purporting to determine an initiative's invalidity, had nevertheless proceeded to "retroactively validate" the local officials' refusal to submit the measure to the voters by determining that the result was correct:  *Farley v. Healey* (1967) 67 Cal.2d 325; *deBottari v. Norco City Council* (1985) 171 Cal.App.3d 1204; and *Citizens for Responsible Behavior v. Superior Court* (1991) 1 Cal.App.4th 1013.  *See Save Stanislaus, supra*, 13 Cal.App.4th at 149.  As the Court of Appeal emphasized in *Save Stanislaus*, those cases do not by any means reflect "a judicial recognition that legislative review [of an initiative's validity] is permissible, and judicial review is merely used to determine whether the local government is right or wrong.  Not so.  The law is clear:  A local government is not empowered to refuse to place a duly certified initiative on the ballot."  *Ibid.*

It is significant that following the *Save Stanislaus* Court's clarification of this issue and admonishment, *there does not appear to be a single reported decision in which an appellate court has upheld a local governing body's unilateral refusal to place a qualified initiative on the ballot based upon purported concerns over the measure's substantive invalidity.*

9

---

1   duty to process and submit initiative and referendum measures." (citations omitted)

2   • *Citizens Against a New Jail v. Board of Supervisors* (1977) 63 Cal.App.3d 559, 561:

3   "Statute requires that upon the filing of such an initiative petition so signed, the board may adopt

4   the proposed ordinance without change or, if it does not, 'the ordinance, without alteration, shall

5   be submitted by the board to the voters at the next general election.'  This duty to submit the issue

6   is mandatory and ministerial."

7   • *Baroldi v. Denni* (1961) 197 Cal.App.2d 472, 477:  "Upon the filing [of the city clerk's

8   certification] it became the ministerial duty of the City Council to order at once a special election

9   . . . to determine the question of recall."

10   • *Martin v. Board of Trustees of Menlo Park* (1929) 96 Cal.App. 705, 707: "Here the petition

11   contains all the requirements of the statute and is properly certified to by the city clerk.  This being

12   so, it is the duty of the board to call the election."

13   • *Ratto v. Board of Trustees* (1925) 75 Cal.App. 724, 726-27: "[U]nder the statute no discretion

14   is vested in the trustees as to the question of calling such election, providing the petition contains

15   the statements required by the statute, and is properly certified by the clerk as to the number of

16   signatures."

17   The rule laid down in these cases — mandating that the Board of Supervisors *first* fulfill its

18   ministerial obligation to schedule an election on a qualified initiative measure and only *then*, should it believe

19   the measure to be invalid, file a lawsuit seeking to have *the court* remove the measure from the ballot under

20   the legal standards applicable to pre-election challenges — ensures that a qualified initiative will "reach the

21   ballot without delay or excessive expenditures of time, money, and effort."  *Gage v. Jordan, supra*, 23

22   Cal.2d at p. 799.  If, by contrast, a local governing body were permitted to rely upon the purported

23   invalidity of an initiative as a justification for unilaterally refusing to place the measure on the ballot, *every*

24   initiative proponent would likely find himself or herself having to initiate and prosecute a court action simply

25   to compel the measure's placement on the ballot.  *See Gayle v. Hamm* (1972) 25 Cal.App.3d 250, 258

26   (permitting county to defend its refusal to process initiative petition by litigating the validity of the proposed

27   measure in writ of mandate action brought by initiative proponents "would be tantamount, in our opinion,

28   to requiring every proponent of an initiative measure to first seek the advisory opinion of the courts as to

10

1    its validity before getting the measure to the electorate").

2        Moreover, requiring the local legislative body to schedule the election first and litigate the validity

3    of the initiative later is the only means of ensuring that the citizens' initiative and referendum rights are

4    preserved during the pendency of the judicial proceedings.   Preparing for the vote on a ballot measure

5    requires many preliminary actions and substantial lead time prior to Election Day:  Ballot arguments for and

6    against the measure must be prepared and made available for public examination and possible legal

7    challenge; rebuttal arguments must likewise be drafted and reviewed; the ballots and sample ballots must

8    be finalized sufficiently in advance of the election that they can be printed and mailed to the voters in time

9    for them to request, receive, and return absentee ballots; and the voters, of course, must be given ample

10   opportunity to educate themselves and consider the proposed ballot measures before casting their ballots.

11   As a result, the Elections Code provides that the determination to place an initiative on the ballot must

12   usually be made at least 88 days before the election.  As the Court recognized in *Save Stanislaus*, if the

13   governing body were permitted to keep a qualified initiative off the ballot unless and until its proponents

14   were able to secure a court order compelling the measure to be submitted to the voters, "[s]uch action by

15   local government could well be timed in such a way as to render the government's conduct unreviewable."

16   13 Cal.App.4th at 147.

17       The *Save Stanislaus* Court amplified on these concerns in another decision it issued two years

18   later:

19       "Our holding that a duly certified ballot measure should be presented to the voters unless

20       there was a 'compelling showing' to the contrary was a pragmatic one.   Initiative and

21       referendum measures usually arise from a controversial or unpopular local government

22       action.   There is usually insufficient time for full appellate consideration of a ballot measure

23       before the election.   As a result, the unilateral decision by local government officials to

24       keep a measure off the ballot effectively may thwart the initiative/referendum process,

25       unless trial courts vigilantly protect the process by allowing the election to go forward

26       except when the invalidity of the measure is 'clear beyond a doubt.'" *Memorial Hospitals*

27       *Ass'n v. Randol* (1995) 38 Cal.App.4th 1300, 1306, *quoting Gayle v. Hamm, supra*,

28       25 Cal.App.3d at 258.

1    That is exactly what is happening in the present case.  Pursuant to Elections Code section 9118,

2    the Board was obligated at the February 28, 2006, meeting either to adopt the General Plan Amendment

3    Initiative or to submit it to a vote in the upcoming June 6, 2006, primary election.  The Board knew full well

4    that it had a mandatory and ministerial duty to submit the duly certified Initiative to the voters, and it knew

5    full well that if it did not do so, it would be sued by the Initiative's proponents — **County Counsel told**

6    **the Board exactly that**!  Yet the three-to-two majority of the Board refused to call for an election on the

7    Initiative, knowing that the statutory deadline for placing the measure on the June 6, 2006, ballot was

8    March 10, only days away.  The Board majority evidently hopes that by the time a court issues its ruling,

9    it might be too late to include the Initiative on the June ballot.  *Cf. Save Stanislaus, supra*, 13 Cal.App.4th

10   at 147-48 ("if the trial court here had failed to order the initiative onto the ballot in the present case, the time

11   sequence may well have prevented relief from the Board's action").  As the Court of Appeal urged in

12   *Memorial  Hospitals  Ass'n  v.  Randol,*  this  Court  must  therefore  "vigilantly  protect"  the

13   initiative/referendum process by ordering the election on the General Plan Amendment Initiative to go

14   forward.[6]

15           **2.      No Court Has Ever Held that the Federal Voting Rights Act**
                       **Requires Plaintiffs' Privately Circulated Initiative Petitions to Be**
16                     **Printed in Spanish.  In Fact, the Courts of Appeals in Two Circuits**
                       **Have Specifically *Rejected* Just Such an Argument.**
17

18           In their Notice of Removal, Defendants assert that they "refused to place the Initiative on the

19   upcoming ballot, because to do so would have been inconsistent with the provisions of [the Federal Voting

20

21           [6]As the cases cited above make clear, the Board's duty to place the General Plan Amendment
     Initiative on the June 6, 2006, ballot "remains, even where performance of that duty is beyond the statutory
22   time frame."  *Native American Sacred Site, supra*, 120 Cal.App.4th at 966; *accord, MHC Financing*
     *Limited Partnership Two v. City of Santee* (2005) 125 Cal.App.4th 1372, 1384.  The Court of Appeal
23   in *Native American Sacred Site* reviewed a number of prior cases, including *Goodenough v. Superior*
     *Court* (1971) 18 Cal.App.3d 692 and *Duran v. Cassidy* (1972) 28 Cal.App.3d 574, in which courts had
24   issued writs of mandate ordering initiatives to be placed on the ballot even though the statutory deadline
     for such action had passed.  In *Goodenough*, for example, the Court of Appeal held that "failure to comply
25   with the time period, what it described as a 'procedural detail{,} will not be permitted to defeat the clear
     purpose of the statute to bring initiative measures to an early vote.'"  *Native American Sacred Site, supra*,
26   120 Cal.App.4th at 966, *quoting Goodenough, supra*, 18 Cal.App.3d at 696-97.  Thus, as long as it is
     still physically possible to include the General Plan Amendment Initiative on the June 6, 2006, primary
27   election ballot, that is the order that the Court must issue.  *See Goodenough, supra*, 18 Cal.App.3d at
     p. 697 ("Time for a proper notice of election must be provided.  Subject to that condition no other time
28   limit applies.").

                                            12

1   Rights Act of 1965 ('FVRA')], and *might have* rendered the County defendants in violation of FVRA."

2   Notice of Removal, ¶ 4 (emphasis added).  Specifically, Defendants contend that under the Ninth Circuit's

3   recent decision in *Padilla v. Lever*, 429 F.3d 910 (9th Cir. 2005), "the measure *apparently* violates"

4   Section 203 of FVRA, 42 U.S.C. § 1973aa-1a, because the initiative petitions that Plaintiffs circulated

5   among the County's voters were not translated into Spanish.  *Ibid*. (emphasis added).  Defendants' half-

6   hearted and belated excuse for refusing to comply with their ministerial duty under state law is without

7   merit.[7]

8        Section 203, subdivision (c), of the FVRA provides in pertinent part:

9              "Whenever any State or political subdivision subject to the prohibition of

10          subsection (b) of this section provides any registration or voting notices, forms, instructions,

11          assistance, or other materials or information relating to the electoral process, including

12          ballots, it shall provide them in the language of the applicable minority group as well as in

13          the English language."  42 U.S.C. § 1973aa-1a(c).

14   The FVRA's multilingual requirements therefore apply only where: (1) the State or a political subdivision

15   "provides" voting notices or other materials or information; and (2) those materials "relat[e] to the electoral

16

---

17        [7]There is every reason to believe that Defendants' reliance upon the Voting Rights Act is merely
18   a pretext to conceal their true motivation for refusing to submit the General Plan Amendment Initiative to
     the voters — that a majority of the Board opposes the *substance* of the proposed Initiative.  Despite the
19   statement in Defendants' Notice of Removal that the asserted FVRA concern was "one of the primary
     reasons" why the Board refused to place the duly certified initiative on the ballot, *not a single word* about
20   the alleged FVRA violations was mentioned by any of the Supervisors as a purported ground for refusing
     to submit the Initiative to the voters; instead, all of the Supervisors' stated objections focused entirely on
21   the Initiative's substantive provisions.  Moreover, just one month before refusing to place the General Plan
     Amendment Initiative on the ballot on the alleged ground that doing so would violate the FVRA, the Board
22   of Supervisors voted — without any concern for compliance with the FVRA — to place a referendum
     measure on the same June 6 ballot even though its petitions had likewise been printed and circulated only
     in English.  *See* Woocher Decl., ¶ 5.

23        In any event, under California law, it is the County Registrar of Voters — not the Board of
24   Supervisors — who has the legal responsibility and obligation to ensure that initiative and referendum
     petitions comply with all constitutional and statutory requirements.  *See, e.g., Billig v. Voges* (1990) 223
25   Cal.App.3d 962, 969 ("the offices of city clerks throughout the state are mandated by the constitution to
     implement and enforce the statute's procedural requirements").  The General Plan Amendment Initiative
26   was determined to be procedurally sufficient by Monterey County Registrar of Voters Tony Anchundo,
     who duly — and rightly — certified the sufficiency of the Initiative for the ballot on January 26, 2006.  The
27   Board of Supervisors had no authority to make its own, unilateral determination to "overrule" the
     Registrar's certification of the initiative on procedural grounds.  To the contrary, the laws is clear that upon
28   receiving the Registrar's certification, the Board had a ***ministerial obligation*** to submit the Initiative to
     the voters at the June 6, 2006, primary election.

13

---

*Melendez et al. v. Board of Supervisors et al.*
Plaintiffs' Memorandum of Law in Support of TRO and OSC re: Preliminary Injunction
Case No. C 06-1730 JW

1   process."

2         In *Padilla*, a divided panel of the Ninth Circuit Court of Appeals ruled that privately circulated

3   ***recall petitions*** are subject to Section 203(c) of the Voting Rights Act. *See Padilla*, 429 F.3d at 915

4   ("the central dispute is whether *recall petitions* fall under the Act's translation requirements") (emphasis

5   added).[8]  Even if *Padilla* remains good law, however, nothing in that opinion justifies expanding the Court's

6   holding or reasoning to require that ***initiative petitions*** must also be translated into multiple languages,

7   much less that initiative petitions circulated ***prior to the issuance of the Padilla opinion*** must be

8   invalidated for violating the FVRA.  To the contrary, both the majority opinion and the plaintiffs in the

9   *Padilla* case were careful to ***distinguish*** the recall process in California from the initiative process in this

10  state and elsewhere.

11        The majority opinion in *Padilla* held that recall petitions fell within the ambit of Section 203(c) —

12  which, as noted above, only applies to election materials that are "provided" by the state — because, unlike

13  the initiative process, the recall process under the California Elections Code involves significant state

14  involvement. *Padilla*, 429 F.3d at 922 ("Recall petitions in California are subject to extensive regulations

15  that go beyond imposing mere ministerial duties upon elections officials. *See* Cal. Elec. Code § 11000 et

16  seq.").  Specifically, elections officials are required to review ***and approve*** recall petitions ***prior to*** their

17  circulation.  As the court explained, "California law prohibits *any* private party from circulating a recall

18  petition until the petition receives state approval. . . . By reviewing and approving the Recall Petition for

19  circulation, the Orange County Elections Department officially sanctioned the content and format of the

20  petition, including its printing only in English.  Elections officials could have altered the text of the petition

21  or demanded that the Recall Proponents publish it in Spanish as well as English, but chose not to do this

22  and instead approved the petitions in their English-only form."  *Id.* at 923-24; *see* Cal. Elec. Code, §

23  11042(a) (charging elections officials with "ascertain[ing] if the proposed form and wording of the petition

24  _____

25      [8]The mandate in *Padilla* has not yet issued because petitions for rehearing and for rehearing en
    banc are still pending before the panel and the full Ninth Circuit.  Indeed, the Court called for a response

26  to the petition for rehearing en banc almost three months ago, a necessary step before either petition for
    rehearing can be granted.  It is thus not clear at this time whether the panel's decision will withstand review

27  by the full Court — or, for that matter, by the U.S. Supreme Court — especially since the petition for
    rehearing en banc was supported by *amicus curiae* letters from, among others, the Secretaries of States

28  of California, Nevada, Arizona, and Washington, as well as the California State Association of Counties.
    *See* Woocher Decl., Exhs. 6-9.

1    meets the requirements of this chapter"); *id.*, § 11042(d) ("No signature may be affixed to a recall petition

2    until the elections official . . . has notified the proponents that the form and wording of the proposed petition

3    meet the requirements of this chapter."). "This state approval," the *Padilla* panel believed, constituted

4    "sufficient state involvement to trigger application of the bilingual requirements and to conclude that the state

5    'provided' the Recall Petition within the meaning of the Voting Rights Act." 429 F.3d at 924.

6         By contrast, state regulation of *initiative petitions* is minimal. In particular, there is no review and

7    approval by the state of the form or content of an initiative petition ***prior*** to its circulation. The elections

8    official has neither the authority nor the opportunity to alter the text of an initiative petition or to demand that

9    it be published in any language other than English. Indeed, the first time an elections official ever ***sees*** an

10   initiative petition is ***after*** it has been privately circulated and it has been submitted for verification of the

11   signatures on it. *See generally* Cal. Elec. Code, § 9100 et seq. And at that point, the role of the elections

12   official is purely ***ministerial***, limited to determining the petition's compliance with the ***procedural***

13   requirements of the Code. *See Alliance for a Better Downtown Millbrae v. Wade* (2003) 108

14   Cal.App.4th 123 (elections officials are foreclosed from making "decisions that are discretionary or go

15   beyond a straightforward comparison of the submitted petition with the statutory requirements for

16   petitions"); *Ley v. Dominguez* (1931) 212 Cal. 587, 602 ("duties and powers of the city clerk in reference

17   to his examination of referendum petitions . . . are purely ministerial and not judicial"). In sum, California

18   elections officials do not initiate the petition process, do not draft the language of an initiative petition, do

19   not review, approve, or alter the substance of the petition, and do not play any role in circulating an initiative

20   petition to the voters. There is simply no way that the state could be considered to "provide" the initiative

21   petition so as to bring it within the coverage of Section 203 of the FVRA.[9]

22

23   ⁹There are many other factors that distinguish initiative petitions from recall petitions as they might
24   relate to the FVRA analysis. For instance, whereas recall petitions are statutorily limited to including a
     [maximum] 200-word statement of the reasons for the proposed recall and a [maximum] 200-word answer
25   from the elected official who is the subject of the proposed recall, initiative petitions must include the "full
     text" of the measure that is proposed to be enacted and will therefore be quite voluminous. The General
26   Plan Amendment Initiative in this case, for example, consisted of some 60 pages of 8 ½ x 14 inch text, plus
     19 separate charts and maps. To require private parties to have to pay the costs of translating and printing
27   initiative petitions into sometimes-multiple foreign languages would severely chill, if not entirely thwart, their
     fundamental constitutional right to petition their government for redress of grievances. When Congress
28   mandated in Section 203 that "[w]henever *any State or political subdivision . . . provides* any registration
     or voting notices . . . or other materials or information relating to the electoral process, including ballots,

1    In fact, this was precisely the conclusion of the only two Courts of Appeals to have considered

2    whether *initiative petitions* are subject to Section 203(c) of the FVRA. In *Montero v. Meyer*, 861 F.2d

3    603 (10th Cir. 1988) and *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988), both the Tenth Circuit and

4    the Eleventh Circuit Courts of Appeals held that citizen-sponsored initiative petitions *did not* have to be

5    printed and circulated in languages other than English because they were neither "materials relating to the

6    electoral process," nor were they "provided" by the state.[10]  The courts in these cases emphasized that in

7    reviewing the initiative petitions for compliance with certain statutory requirements regarding the permissible

8    form (and in some respects, such as with single-subject rule compliance, the content) of the petitions, the

9    elections officials were performing a ministerial function that did not convert the private actions of the

10   initiative proponents into state action.  *See Montero v. Meyer*, 861 F.2d at p. 610 ("The acts performed

11   by those officers are designed primarily to make the initiative process fair and impartial, and do not

12   constitute providing the petitions to the electorate."); *Delgado v. Smith*, 861 F.2d at 1496 ("the Florida

13   Secretary of State is charged with limited ministerial duties regarding the initiative process.  As discussed

14   above, the Secretary must determine whether the total number and geographic distribution of petitions is

15   proper, approve the format of the petition, and finally submit it to the Attorney General of Florida certifying

16   that the formal petition requirements have been complied with.  However, contrary to appellants' position,

17   these duties do not constitute state formulation of the initiative petition.")  As the Court of Appeals

18   summarized Florida's initiative process in *Delgado v. Smith*:

19           "No state action link exists between the proponents of the English language petition

20       and the state statutory scheme.  The state does not initiate the petition, does not draft the

21       language of the petition, does not address the merits of the proposal and does not

22

23   *it shall provide them* in the language of the applicable minority group as well as in the English language,"
     it surely did not contemplate that private citizens would be forced thereby to expend tens of thousands of
24   dollars in order to exercise their constitutional right of petition.

25       [10]Both courts also expressed the view that an interpretation of the FVRA that required initiative
     petitions to be printed in multiple languages would raise serious concerns under the First Amendment by
26   imposing "a substantial burden on the right of political association." *Delgado v. Smith*, 861 F.2d at 1494-
     95 ("It is hard to imagine that in passing the Act, Congress could have intended that private citizens seeking
27   to further their own political goals through the initiative petition process be subject to specific language
     requirements."); *see also Montero v. Meyer*, 861 F.2d at 609 ("so long as the right of initiative remains
28   reserved to the people, the state cannot diminish or impede that process").

1    participate in any way in the circulation of the petition or in the collection of signatures.

2    Rather, all of this action is taken by private citizens.  The state's responsibility is to ensure

3    that the petition meets the requirements of law and will fairly present the proposition that

4    may or may not be placed before the electorate.  Such regulation is not sufficient to

5    transpose such private conduct into state action." *Id.* at 1497.

6        The Ninth Circuit panel in *Padilla* relied upon these same differences between the initiative

7    processes in Florida and Colorado and the recall scheme in California to distinguish the *Montero* and

8    *Delgado* decisions.  *See Padilla*, 429 F.3d at 917-18 ("For instance, under Florida law, Florida elections

9    officials are limited to verifying only that a proposed initiative petition complies with applicable format

10   requirements; the regulations do not provide for a review of the petition's contents. . . . Unlike Colorado,

11   California recall proponents are statutorily required to alter their recall petition as directed by elections

12   officials until elections officials are satisfied that no further alterations are required.").  The plaintiffs in

13   *Padilla*, represented by the same attorney who represents the plaintiffs in *Madrigal v. County of*

14   *Monterey* (No. C06-01407 (RS)), likewise stressed that the different statutory frameworks were critical

15   in determining whether the requisite degree of state involvement existed to support a conclusion that the

16   state "provides" the election materials under the FVRA: "If election officials in Florida and Colorado do

17   not have the ultimate determination to require changes to the content of a petition, then for all practical

18   purposes, the states are not providing any election materials and are instead performing ministerial duties

19   in the conduct of elections."  Plaintiffs-Appellants' Response to Petition for Rehearing en Banc in *Padilla*

20   *v. Lever*, pp. 7-8 (attached as Exhibit 10 to Woocher Decl.).  Just as the privately circulated initiative

21   petitions in Colorado and Florida were not "provided" by the state in *Montero* and *Delgado*, Plaintiffs'

22   Initiative here was not "provided" by the County, either.

23       Nor is there any basis for applying *Padilla*'s newly announced interpretation of the FVRA — even

24   assuming it were to apply to initiative petitions — ***retroactively*** so as to invalidate petitions, such as the

25   General Plan Amendment Initiative petition in this case, that were circulated in good faith prior to the

26   issuance of the panel's decision on November 23, 2005.  When, as occurred in *Padilla*, a new rule is *not*

27   applied in the very case in which it is announced, courts may — and should — properly refuse to apply

28   it retroactively.  *See George v. Camacho*, 119 F.3d 1393, 1399 n.9 (9th Cir. 1997) (a new rule must be

1    applied to pending cases only "if the new rule is applied in the case in which it was announced").  Rather,

2    courts will refuse to apply decisions retroactively when: (1) the decision establishes a new principle of law;

3    (2) the retroactive application of the decision will retard, not further, the purposes of the rule in question;

4    and/or (3) the retroactive application of the decision will produce substantially inequitable results.  *Id.* at

5    1401; *accord, Austin v. City of Bisbee, Arizona*, 855 F.2d 1429, 1432-43 (9th Cir. 1988).

6        Here, all three factors mandate that the *Padilla* decision not be applied retroactively.  First, the

7    decision not only established a new rule, it actually *reversed* a prior one.  The Courts of Appeals in

8    *Montero* and *Delgado* had expressly rejected claims that citizen-sponsored initiative petitions must comply

9    with the minority language requirements of the FVRA, and even the District Court in *Padilla* had likewise

10   ruled *almost three years ago* that recall petitions in California do not have to be printed in multiple

11   languages.  Although the Ninth Circuit panel opinion subsequently reversed the District Court's ruling,

12   surely those citizens in California who — like Plaintiffs here — had relied in good faith upon these previous

13   rulings to circulate their initiative petitions only in English should not now have the thousands of signatures

14   they gathered invalidated and the elections they petitioned for canceled because they did not have the

15   foresight to predict the panel majority's decision.  *See, e.g.*, *Austin v. City of Bisbee, Arizona, supra*, 855

16   F.2d at 1433 (refusing to apply new decision retroactively where it "overruled clear past precedent").

17       Similarly, the purpose of the rule in question — to promote "full participation in the electoral

18   process" (*see Padilla*, 429 F.3d at 924) — would be retarded, not furthered, by invalidating the Initiative

19   petition in this case.  *Every one of the more than 15,000 persons who signed that petition did so*

20   *precisely because they wanted to participate in the electoral process by exercising their*

21   *constitutionally protected right of initiative.*  Even if it were the case that *more citizens* (i.e., minority

22   language speakers) would be able to fully participate in the electoral process if, in the future, recall and

23   other petitions were printed in multiple languages, that is no reason to nullify the petitions that have already

24   been circulated and qualified for the ballot even without these additional individuals' full participation.  The

25   retroactive application of *Padilla*'s new rule to this Initiative would serve only to deny those who have

26   already signed the petitions their fundamental constitutional rights and frustrate their efforts to participate

27   in the electoral process.

28       Finally, applying the *Padilla* decision retroactively would produce substantially inequitable results.

18

Plaintiffs reasonably relied upon the California Elections Code, the appellate decisions in *Montero* and *Delgado*, and the District Court's ruling in *Padilla* itself in drafting and circulating their petitions in English only.  Countless initiative petitions have circulated and qualified for the ballot throughout the State of California that were printed only in English, and ***never before had a single one of them been declared unlawful under the FVRA***.  Indeed, on the same June 2006 primary ballot on which Plaintiffs' General Plan Amendment Initiative should be appearing will be Proposition 82, which was circulated in English only, and 53 other statewide initiative petitions have been submitted or are in circulation with the hope of appearing on the November 2006 ballot — every one of which is printed only in English.  To suddenly change the "rules of the game" now, after Plaintiffs have completed the process and have done exactly what had been required of them to qualify their initiative for the ballot, would "penaliz[e] [those] parties who ordered their affairs in reasonable reliance on a rule of law that was later invalidated." *Austin*, 855 F.2d at 1432.

In sum, there is no basis for the Board's asserted claim that it would violate the Voting Rights Act to submit Plaintiffs' Initiative to Monterey County's voters at the June primary election.  No court has ever held that privately circulated initiative petitions must be printed in Spanish, and even if the panel's opinion in *Padilla* could be read to support such a result, it should not be applied retroactively to invalidate certified initiative petitions like Plaintiffs' that were circulated prior to the issuance of that decision.[11]

**B.     THE BALANCE OF HARDSHIPS WEIGHS ENTIRELY IN PLAINTIFFS' FAVOR**

Under the second prong of the test for issuance of preliminary injunctive relief, the Court considers whether the *equities* weigh in favor of or against granting the requested relief.  In the present case, all of the equities support granting the TRO and preliminary injunction, for Plaintiffs face a significant threat of

---

[11]Defendants' half-hearted suggestion that the Board also refused to submit the Initiative to the voters because doing so "might have placed the County Defendants in violation of the pre-clearance provisions of FVRA" (Notice of Removal, ¶ 5) is equally without merit.  The Supreme Court has held that "a covered jurisdiction need not seek preclearance before *enacting* legislation that would effect a voting change.  Preclearance is required before actually *administering* a change . . . ." *Lopez v. Monterey County*, 525 U.S. 266, 279 (1999) (internal citations omitted; emphasis in original); *see also* 28 C.F.R. § 51.21 ("Changes affecting voting should be submitted as soon as possible *after* they become final.") (emphasis added).  Accordingly, the County of Monterey need not seek pre-clearance unless and until the General Plan Amendment Initiative is approved by voters.  More fundamentally, even if enacted by the voters, the Initiative would not effect a change to a "standard, practice, or procedure with respect to voting," and would therefore not trigger the pre-clearance requirements of the Voting Rights Act in any event.

1  irreparable injury in the absence of the requested provisional relief, whereas no harm will befall Defendants

2  from issuing the TRO and preliminary injunction.

3          As noted in the ex parte application, the TRO requested by Plaintiffs merely seeks to *preserve*

4  *the option* of having the General Plan Amendment Initiative appear on the June 6, 2006, ballot by requiring

5  Defendant Registrar of Voters Anchundo to accept ballot arguments for and against the measure, so that

6  there will be no delay in preparing the Voter Information Pamphlet in the event the Court were ultimately

7  to rule that the Initiative should be submitted to the voters.  The preliminary injunction requested by Plaintiffs

8  similarly seeks to preserve a place on the June ballot for the General Plan Amendment Initiative by requiring

9  that the ballots and Voter Information Pamphlet for the June election not be sent to the printer without

10  including the Initiative.

11          The Court of Appeals has held that "the fact that a case raises serious First Amendment questions

12  compels a finding that there exists 'the potential for irreparable injury, or that at the very least the balance

13  of hardships tips sharply in [Appellants'] favor.' *Viacom Int'l, Inc. v. FCC*, 828 F.Supp. 741, 744

14  (N.D.Ca.1993).  'Under the law of this circuit, a party seeking preliminary injunctive relief in a First

15  Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating

16  the existence of a colorable First Amendment claim.' *Id*. (citing *San Diego Committee v. Governing*

17  *Board*, 790 F.2d 1471 (9th Cir.1986))." *Sammartano v. First Judicial District Court*, 303 F.3d 959,

18  973 (9th Cir. 2002); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[t]he loss of First Amendment

19  freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of

20  the issuance of a preliminary injunction).

21          Additionally, "[i]n cases where the public interest is involved, the district court must also examine

22  whether the public interest favors the plaintiff." *Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th

23  Cir.1992).  "Courts considering requests for preliminary injunctions have consistently recognized the

24  significant public interest in upholding First Amendment principles." *Sammartano*, 303 F.3d at 974; *see,*

25  *e.g., Iowa Right to Life Committee, Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (district court

26  did not abuse its discretion in granting a preliminary injunction because "the potential harm to independent

27  expression and certainty in public discussion of issues is great and the public interest favors protecting core

28  First Amendment freedoms"); *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071,

1   1079 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's constitutional

2   rights"); *Cate v. Oldham*, 707 F.2d 1176, 1190 (11th Cir.1983) (the "strong public interest in protecting

3   First Amendment values" favored preliminary injunctive relief).

4            Plaintiffs will almost surely suffer irreparable harm if interim injunctive relief is not granted in this

5   case, because the printing deadline for the June election would otherwise likely pass before a final decision

6   can be obtained from this Court on the merits, thereby effectively preventing their qualified Initiative from

7   appearing on the June ballot and denying the thousands of voters who signed the Initiative petitions their

8   constitutional right to a timely election on the measure.  Just last month, the California Supreme Court again

9   emphasized the courts' obligation to protect the citizens' exercise of the initiative power against

10  unwarranted attempts to prevent a vote on a qualified measure:

11           "Particularly when a preelection challenge is brought against an initiative measure that has

12           been signed by the requisite number of voters to qualify it for the ballot, the important state

13           interest in protecting the fundamental right of the people to propose statutory or

14           constitutional changes through the initiative process requires that a court exercise

15           considerable caution before intervening to remove or withhold the measure from an

16           imminent election." *Costa v. Superior Court* (2006) 39 Cal.Rptr.3d 470, 483 [128 P.3d

17           675].

18           Over 15,000 Monterey County residents signed the General Plan Amendment Initiative petition,

19  and tens of thousands more support the demand for a vote on the Initiative.  If the Initiative is prevented

20  from appearing on the June ballot, these residents and the public interest will be irreparably harmed by the

21  denial of their First Amendment right to petition their government and by the deprivation of their right to

22  have a meaningful say on the most important land-use and quality-of-life issues facing their community.  By

23  contrast, no harm will befall Defendants from the relief requested.  If this Court were to rule that Initiative

24  is not entitled to be submitted to the voters, the measure could readily be removed from the ballot — more

25  readily, certainly, than it could be added to the ballot at a later date — or the Initiative could simply not be

26  given effect if it were to remain on the ballot and be approved by the voters.  Moreover, even if the Court

27  were ultimately to conclude that the Initiative petitions should have been printed in Spanish as well as

28  English, there will be no harm from scheduling a vote on the measure, because (1) nobody has ever credibly

1   suggested that the Initiative would not have qualified for the ballot if the petitions had *also* been printed in

2   Spanish, and (2) the ballots and all of the other election materials that will be provided to the voters in

3   connection with the June election *will be available* in both Spanish and English.  Even as a fiscal matter,

4   it will be much less costly to consolidate the election on the Initiative with the upcoming statewide primary

5   election than it would be to hold a special, stand-alone election on the measure if it were not ordered onto

6   the ballot in time for the June election.  All of the equities, therefore, favor granting the injunctive relief

7   requested by Plaintiffs.

8   **II.    ALTERNATIVELY, AFTER ISSUING THE REQUESTED TEMPORARY**
        **RESTRAINING ORDER, THIS ACTION SHOULD BE REMANDED TO**
9       **STATE COURT**

10          As demonstrated above, due to the urgency occasioned by the impending ballot printing deadlines,

11  this Court should issue a TRO and set an expedited hearing on the Order to Show Cause Re: Preliminary

12  Injunction.  In the alternative, if the Court were to find that it lacks subject matter jurisdiction to proceed

13  further because there is no merit to Defendants' FVRA defense, this action should promptly be remanded

14  to the state court.

15          Courts "strictly construe" removal statutes against removal jurisdiction.  *Gaus v. Miles, Inc.*, 980

16  F.2d 564, 566 (9th Cir. 1992).  Federal removal must be rejected if there is any doubt as to the right of

17  removal in the first instance.  *Id.*; *see also Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09

18  (1941).  This "strong presumption" against removal jurisdiction means that the "defendant always has the

19  burden of establishing that removal is proper."  *Gaus*, 980 F.2d at 566.

20          Defendants removed this action under 28 U.S.C. § 1443, which was enacted to protect state

21  officers from being penalized for failing to enforce discriminatory state laws or policies by providing a

22  federal forum in which to litigate those issues.  *City and County of San Francisco v. Civil Service*

23  *Commission of the City and County of San Francisco*, No. 02-03462, 2002 WL 1677711, at *4

24  (N.D. Cal. July 24, 2002) (quoting *Detroit Police Lieutenants and Sergeants Ass'n v. City of Detroit*,

25  597 F.2d 566 (6th Cir. 1979)).  This rarely used provision permits removal where a state official is sued

26  in state court for "refusing to do any act on the ground that it would be inconsistent with" a law providing

27  for equal rights.  28 U.S.C. § 1443(2).  Courts have further explained that for section 1443(2) to apply,

28  defendants must show a "colorable conflict" between state and federal law leading to their refusal to follow

---

22

1  plaintiffs' interpretation of state law. *City and County of San Francisco*, 2002 WL 1677711, at *4; *see*

2  *also Alonzo v. City of Corpus Christi*, 68 F3d 944, 946 (5th Cir. 1995) (same).  If no colorable conflict

3  exists, removal is improper. *City and County of San Francisco*, 2002 WL 1677711, at *4.

4       If, after issuing the requested TRO and providing Defendants with an opportunity to respond to the

5  OSC Re: Preliminary Injunction, this Court concludes that no "colorable conflict" exists in this case, then

6  it should immediately remand the case to the state courts, while maintaining the TRO during the interim.

7  Were the Court merely to remand the case without granting or preserving the temporary restraining order,

8  Defendants would have achieved their illegitimate objective of delaying these proceedings through an

9  improper removal petition long enough to prevent Plaintiffs from obtaining the relief to which they are

10  entitled — the submission of the General Plan Amendment Initiative to the voters at the June 6, 2006,

11  primary election.

12

13  DATE: March 14, 2006           Respectfully Submitted,

14                    STRUMWASSER & WOOCHER LLP

15                    Fredric D. Woocher
                  Michael J. Strumwasser

16                    LAW OFFICE OF J. WILLIAM YEATES

17                    J. William Yeates
                  Keith G. Wagner

18                    Jason R. Flanders

19

20                    By          / s /
                         Fredric D. Woocher

21

22                    *Attorneys for Petitioners and Plaintiffs*
                  *William Melendez, Ken Gray, Jyl Lutes,*

23                    *Carolyn Anderson, and Landwatch Monterey*

24

25

26

27

28

23