1   FREDRIC D. WOOCHER (SBN 96689)
    MICHAEL J. STRUMWASSER (SBN 58413)
2   STRUMWASSER & WOOCHER LLP
    100 Wilshire Boulevard, Suite 1900
3   Santa Monica, California  90401
    Telephone:     (310) 576-1233
4   Facsimile:     (310) 319-0156
    E-mail:  fwoocher@strumwooch.com
5
6   J. WILLIAM YEATES (SBN 84343)
    KEITH G.WAGNER (SBN 210042)
7   JASON R. FLANDERS (SBN 238007)
    LAW OFFICE OF J. WILLIAM YEATES
8   3400 Cottage Way, Suite K
    Sacramento, CA 95825
9   Telephone:     (916) 609-5000
    Facsimile:     (916) 609-5001
10  E-mail:  byeates@enviroqualitylaw.com
11
    Attorneys for Plaintiffs William Melendez et al.
12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15

16  WILLIAM MELENDEZ, KEN GRAY, JYL          CASE NO.  C 06-1730 JW
17  LUTES, CAROLYN ANDERSON, and
    LANDWATCH MONTEREY COUNTY,
18                                           PLAINTIFFS' MEMORANDUM OF
                                   Plaintiffs,   LAW IN SUPPORT OF REQUEST
19                                           FOR INJUNCTIVE RELIEF
20        v.
21
    BOARD OF SUPERVISORS OF THE COUNTY       Judge:  Hon. James Ware
22  OF MONTEREY; TONY ANCHUNDO, in his       Dept:   8
    capacity as MONTEREY COUNTY REGISTRAR    Date:   March 21, 2006
23  OF VOTERS; COUNTY OF MONTEREY; and       Time:   10:00 a.m.
    DOES 1 through 10, inclusive,
24
25                                 Defendants.
26

27

28

**CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    THE BOARD OF SUPERVISORS HAD A MINISTERIAL DUTY TO SUBMIT PLAINTIFFS' DULY
      CERTIFIED INITIATIVE TO A VOTE OF THE PEOPLE.  IF THE BOARD BELIEVED THE
      INITIATIVE TO BE INVALID, IT WAS REQUIRED TO FIRST SCHEDULE THE ELECTION ON
      THE INITIATIVE AND THEN FILE SUIT SEEKING TO HAVE THE INITIATIVE REMOVED FROM
      THE BALLOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   THE BOARD OF SUPERVISORS' PURPORTED CONCERNS OVER THE GENERAL PLAN
      AMENDMENT INITIATIVE'S VALIDITY DO NOT IN ANY EVENT PROVIDE GROUNDS FOR
      PRE-ELECTION JUDICIAL REVIEW AND WITHHOLDING OF THE INITIATIVE FROM THE
      BALLOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  NO COURT HAS EVER HELD THAT THE FEDERAL VOTING RIGHTS ACT REQUIRES
      PLAINTIFFS' PRIVATELY CIRCULATED INITIATIVE PETITIONS TO BE PRINTED IN SPANISH.
      IN FACT, THE COURTS OF APPEALS IN TWO CIRCUITS HAVE SPECIFICALLY *REJECTED*
      JUST SUCH AN ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    The Ninth Circuit's Decision in *Padilla v. Lever* by Its Terms Applied Only to
            Recall Petitions and Specifically Distinguished the Recall Process in California from
            the Initiative Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    The Only Judicial Decisions to Have Addressed Whether Section 203 of the
            Voting Rights Act Applies to Initiative Petitions Have Held That Initiative Petitions
            Are Not Covered by the Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      C.    The Panel's Decision in *Padilla* Does Not Require or Justify Invalidating the
            General Plan Amendment Initiative Petitioners in This Case and Preventing an
            Election from Being Held on the Initiative in Full Compliance with the Voting
            Rights Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

# TABLE OF AUTHORITIES

## Federal Cases

*Austin v. City of Bisbee, Arizona*, 855 F.2d 1429 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Delgado v. Smith,* 861 F.2d 1489 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 18, 19, 22

*George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Lopez v. Monterey County,* 525 U.S. 266 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Montero v. Meyer,* 861 F.2d 603 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 19

*Padilla v. Lever*, 429 F.3d 910 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## State Cases

*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123 . . . . . . . . . . . 16

*Associated Home Builders etc. v. City of Livermore* (1976) 18 Cal.3d 582 . . . . . . . . . . . . . . . 8

*Billig v. Voges* (1990) 223 Cal.App.3d 962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Brosnahan v. Eu* (1982) 31 Cal.3d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Costa v. Superior Court* (2006) 39 Cal.Rptr.3d 470 . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 9, 10

*Gage v. Jordan* (1944) 23 Cal.2d 794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gayle v. Hamm* (1972) 25 Cal.App.3d 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Independent Energy Producers Association v. McPherson* (2005) 131 Cal.App.4th
298, *rev. granted and opinion superseded by* 31 Cal.Rptr.3d 852
(No. S135819 July 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ley v. Dominguez* (1931) 212 Cal. 587 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Memorial Hospitals Ass'n v. Randol* (1995) 38 Cal.App.4th 1300 . . . . . . . . . . . . . . . . . . . . . 7

*Save Stanislaus Area Farm Economy v. Board of Supervisors*
(1993) 13 Cal.App.4th 141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 6

*Zaremberg v. Superior Court* (2004) 115 Cal.App.4th 111 . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Federal Statutes

28 C.F.R. § 51.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. § 1973aa-1a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

ii

42 U.S.C. § 1973aa-1a(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**State Statutes**

Cal. Elec. Code,

      § 9100 et seq  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      § 9105  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      § 11042(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      § 11042(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Colo. Rev. Stat. § 1-40-105(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Colo. Rev. Stat. § 1-40-106  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fla. Admin. Code Ann. R. 1S-2.009(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fla. Stat. § 16.061  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iii

# INTRODUCTION

Pursuant to the Court's order at the hearing held on March 16, 2006, Plaintiffs William Melendez et al. submit this opening brief on the merits in support of their request for injunctive relief commanding Defendants Monterey County Board of Supervisors and Registrar of Voters Tony Anchundo to place the certified General Plan Amendment Initiative on the ballot for the upcoming June 6, 2006, primary election. As the Court recognized at the March 16 hearing, there are two principal issues in these consolidated cases: (1) Does the Board of Supervisors have a ministerial obligation to place the Initiative on the ballot upon receipt of the certification of sufficiency from the County Registrar, or does the Board have discretion in that regard?; and (2) Does the federal Voting Rights Act of 1965 ("FVRA") prohibit the Board from submitting the Initiative to the voters because the initiative petitions were not printed in Spanish, as well as English?

The first question has been answered dozens of times, and each time the courts have come to the same conclusion. As the Court of Appeal emphatically stated in *Save Stanislaus Area Farm Economy v. Board of Supervisors* ("*Save Stanislaus*") (1993) 13 Cal.App.4th 141, 149, a case that is virtually indistinguishable from the present case:

> "The law is clear: A local government is not empowered to refuse to place a duly certified initiative on the ballot."

California courts have held time and again that the Board of Supervisors has no authority to usurp the *judicial function*, as Defendant did here, by making its own determination regarding the validity or invalidity of a certified initiative. Rather, even if the Board believes the proposed measure is legally flawed, it still must place the measure on the ballot. The Board or some third party with standing may then sue to *remove* the initiative from the ballot, if they so desire.

Equally important, the grounds for removing a qualified initiative measure from the ballot in such a pre-election lawsuit are *extremely limited*, and the burden on the party seeking such relief is *extremely high*. Just last month the California Supreme Court reiterated that in order to safeguard the people's constitutional right of initiative, the *only* type of challenges that were appropriate for pre-election judicial review were those relating to whether an initiative had satisfied the *procedural* prerequisites to qualify for the ballot, and that challenges to the *substantive* validity of a proposed measure should be deferred until

1

1    *after* the measure had been submitted to the voters and the election has been held.  And even with respect

2    to those types of claims that properly may be considered by a court prior to the election, a court should

3    order removal of an initiative from the ballot "only when there are **clear, compelling reasons to do so**."

4    *Costa v. Superior Court*, 39 Cal.Rptr. 470, 483 (2006) (quoting *Zaremberg v. Superior Court*, 115

5    Cal.App.4th 111, 116 (2004)).[1]

6          None of the Board of Supervisors' purported grounds for refusing to certify the General Plan

7    Amendment Initiative even remotely satisfies the stringent standards established by the California Supreme

8    Court for denying the voters their fundamental right to petition their government through the initiative

9    process.  Most of the supposed "legal flaws" identified by the Board's specially retained counsel — the

10   same lawyers who represent the development interests that are vehemently opposed to the Initiative —

11   relate to claimed *substantive* defects that can properly be considered by a court only *after* the election,

12   if the Initiative were to pass.  The Board's remaining claims — that the Initiative violates the single-subject

13   rule and that the petitions did not contain the "full text" of the proposed measure — border on the frivolous,

14   and they certainly do not approach the "compelling showing of invalidity" that is necessary to justify the

15   extraordinary relief of withholding a qualified initiative measure from the ballot.  The Board of Supervisors

16   had no legitimate grounds for refusing to submit the General Plan Amendment Initiative to the voters, even

17   if the law had permitted it to exercise any "discretion" in this regard.

18         The second question — whether the FVRA requires that the Initiative petitions be printed and

19   circulated in Spanish — has also already been answered by the courts, *twice in fact*.  Both the Tenth

20   Circuit Court of Appeals in *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988) and the Eleventh Circuit

21   Court of Appeals in *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988) **expressly held** that citizen-

22   sponsored **initiative** petitions **do not** have to be printed and circulated in languages other than English

23   under the Voting Rights Act.  These are **the only judicial decisions** addressing whether initiative petitions

24   must be printed in multiple languages under the FVRA, and they remain good law today.  In reliance upon

25   this settled law, Plaintiffs and literally *thousands* of other local and state initiative proponents throughout

26   the State of California have for years been circulating — and continue to circulate — initiative petitions only

27   _____

28         [1]For the Court's convenience, a copy of the Supreme Court's decision in *Costa v. Superior Court*
     is included in the accompanying Declaration of Fredric D. Woocher, as Exhibit A.

in English.

Nothing in the Ninth Circuit's recent 2-1 panel decision in *Padilla v. Lever*, 429 F.3d 910 (2005) compels a different result in this case.  The decision in *Padilla* addressed whether **recall petitions** should be printed and circulated in minority languages — not **initiative petitions**.  Indeed, the panel went to great lengths to explain why the **recall** petitions at issue in *Padilla* were **different than** the initiative petitions at issue in *Montero* and *Delgado*, and hence how "these two out-of-circuit cases . . . are **readily distinguishable** from the instant case." *Padilla*, 429 F.3d at 917 (emphasis added).  Mr. Avila — counsel for the *Madrigal* plaintiffs in this case, and counsel for the appellants in *Padilla* — agreed, urging the Ninth Circuit that there was **no conflict** between the decision in *Padilla* and those in *Montero* and *Delgado* because the degree of state involvement in California's **recall** process is much greater than in the **initiative** process in Colorado and Florida, justifying the panel's view that recall petitions are "provided" by the state, whereas initiative petitions are not.

Moreover, even if the panel's decision in *Padilla* were — unjustifiably — extended to apply to privately circulated initiative petitions, it would be wholly inappropriate to enjoin an election on the General Plan Amendment Initiative on that basis.  By the time the panel had issued its opinion in *Padilla*, Plaintiffs had already gathered more than 10,000 signatures on their initiative petitions, having commenced the process of circulating their initiative more than a month earlier.  The initiative qualified with almost 4,000 signatures to spare, and no one seriously contends that any *fewer* signatures would have been gathered had the petitions also been circulated in Spanish.  Perhaps most importantly, *all of the materials relating to the actual **election on the Initiative** will be printed in both English and Spanish **in full compliance with the Voting Rights Act**,* so nobody — not the Madrigal plaintiffs nor anyone else — will be denied their right to participate fully in the electoral process relating the General Plan Amendment Initiative due to their limited proficiency in the English language.  *Padilla* did not hold that the remedy for not having circulated petitions in Spanish is to prohibit the election on the proposed measure from going forward in compliance with the FVRA.  Indeed, in *Padilla* itself, the Court of Appeals had **denied** the plaintiffs' request for an injunction prohibiting the recall election from taking place. *See* 429 F.3d at 914 n. 4.  Ordering such a result in this case would be a perverse implementation of the Voting Rights Act and a manifest injustice to the 15,000 residents of Monterey County who freely and in good faith exercised their

3

constitutional right of initiative by signing the petitions demanding an election in June on the General Plan Amendment Initiative.

## ARGUMENT

**I.    THE BOARD OF SUPERVISORS HAD A MINISTERIAL DUTY TO SUBMIT PLAINTIFFS' DULY CERTIFIED INITIATIVE TO A VOTE OF THE PEOPLE.  IF THE BOARD BELIEVED THE INITIATIVE TO BE INVALID, IT WAS REQUIRED TO FIRST SCHEDULE THE ELECTION ON THE INITIATIVE AND THEN FILE SUIT SEEKING TO HAVE THE INITIATIVE REMOVED FROM THE BALLOT.**

In Plaintiffs' Memorandum of Law in Support of Ex Parte Application for Temporary Restraining Order and OSC Re: Preliminary Injunction, or Alternatively for Remand (filed March 14, 2006), Plaintiffs provided the Court with citations to more than seventy-five years worth of California case law consistently holding that the elected officials against whom the rights of initiative and referendum are exercised have a *ministerial duty* to place a qualified initiative on the ballot for a vote of the people. *Id.*, at 6-13.  Plaintiffs will not repeat that analysis here, but refer the Court to their previous briefing of this issue and incorporate those authorities by this reference.  One case among the dozens holding to the same effect stands out and bears reiterating, however, both because its facts are so *incredibly similar* to those of the present case and because the Court of Appeal specifically insisted upon issuing its published opinion, despite the case's mootness, *in order to provide guidance* once and for all to trial courts that might be confronted, as here, by a local government's "misuse of power" in refusing to place a qualified initiative on the ballot.

In *Save Stanislaus, supra*, just as in the present case, the proponents of a slow-growth initiative proposing to amend the County General Plan had gathered a sufficient number of signatures to qualify their measure for the ballot.  Just as in the present case, the Board of Supervisors referred the proposed initiative to county staff for review and, just as in the present case, staff reported many alleged problems with the initiative, including conflicts with state laws governing local initiatives.  *See* 13 Cal.App.4th at 145.  Just as in the present case, the Board thereupon voted to exclude the initiative from the ballot, contending that it was illegal and that the Board had no obligation to call for an election on an invalid measure.  *Ibid.*

Just as in the present case, the initiative proponents filed a petition for writ of mandate, and the trial court (it is hoped, just as in the present case) ordered the measure placed on the ballot — finding that the Board had not made "a compelling showing that the initiative was clearly invalid as a matter of law." 13

4

1    Cal.App.4th at 146.  Opponents of the initiative (Family Farm Alliance, or FFA) appealed, arguing that

2    the Board had properly exercised its discretion to refuse to submit the initiative to the voters based upon

3    the measure's asserted invalidity.  The Court of Appeal *emphatically disagreed*, rejecting any suggestion

4    that the Board of Supervisors had the authority to review the initiative's validity and unilaterally determine

5    whether to place the matter on the ballot:

6            "FFA and the Board fail to cite a single authority which stands for the proposition

7        that local governments are empowered to exercise discretion in deciding whether to place

8        a duly certified initiative on the ballot.  Such a contention is contrary to established case

9        law.  ***As courts have stated repeatedly and clearly, local governments have the***

10       ***purely ministerial duty to place duly certified initiatives on the ballot.***

11           "The courts have uniformly condemned local governments when these legislative

12       bodies have refused to place duly qualified initiatives on the ballot.  'Given compliance with

13       the formal requirements for submitting an initiative, the registrar must place it on the ballot

14       unless he is directed to do otherwise by a court on a compelling showing that a proper

15       case has been established for interfering with the initiative power.'  (*Farley v. Healey*

16       (1967) 67 Cal.2d 325, 327.)

17           ". . . .

18           "FFA and the Board assert that because courts in [some] cases in fact have gone

19       forward with an analysis of the initiatives after condemning the local government's actions,

20       there is now a judicial recognition that legislative review is permissible, and judicial review

21       is merely used to determine whether the local government is right or wrong.

22           ***Not so.  The law is clear:  A local government is not empowered to refuse***

23       ***to place a duly certified initiative on the ballot.***"

24           "What should a local government do if it believes an initiative measure is unlawful

25       and should not be presented to the voters?  A governmental body, or any person or entity

26       with standing, may file a petition for writ of mandate, seeking a court order removing the

27       initiative measure from the ballot.  ***But such entity or person may not unilaterally***

28       ***decide to prevent a duly qualified initiative from being presented to the***

5

1    *electorate.*"  *Save Stanislaus*, 13 Cal.App.4th at 148-49 (emphases added; citations

2    omitted).[2]

3        The holding of the Court of Appeal in *Save Stanislaus* thus could not have been more forceful, and

4    it is directly — indeed, uncannily — applicable to this case:  The Monterey County Board of Supervisors

5    simply had no legal authority to refuse to place Plaintiffs' certified initiative measure on the ballot.  And in

6    the more than a decade since the Court of Appeal clarified this issue in *Save Stanislaus*, there does not

7    appear to be *a single reported decision* in which an appellate court has upheld a local governing body's

8    unilateral refusal to place a qualified initiative on the ballot based upon purported concerns over the

9    measure's substantive invalidity.

10       The rule laid down in these cases — mandating that the Board of Supervisors *first* fulfill its

11   ministerial obligation to schedule an election on a qualified initiative measure and only *then*, should it believe

12   the measure to be invalid, file a lawsuit seeking to have *the court* remove the measure from the ballot under

13   the legal standards applicable to pre-election challenges — ensures that a qualified initiative will "reach the

14   ballot without delay or excessive expenditures of time, money, and effort."  *Gage v. Jordan* (1944) 23

15   Cal.2d 794, 799.  If, by contrast, a local governing body were permitted to rely upon the purported

16   invalidity of an initiative as a justification for unilaterally refusing to place the measure on the ballot, *every*

17   initiative proponent would likely find himself or herself having to initiate and prosecute a court action simply

18   to compel the measure's placement on the ballot.  *See Gayle v. Hamm* (1972) 25 Cal.App.3d 250, 258

19   (permitting county to defend its refusal to process initiative petition by litigating the validity of the proposed

20   _____

21       [2]The Court of Appeal in *Save Stanislaus* also set forth the standard that an initiative's proponents
     are required to meet in order to be entitled to a judicial order compelling the Board of Supervisors to

22   submit the measure to the voters:

23       "[T]he showing required of SAFE [the initiative proponent] in this matter was extremely
     minimal — and indeed the facts it was required to show were basically admitted by

24   everyone involved.  SAFE had to show that the county registrar had certified that the
     correct number of qualified signatures were submitted in support of the initiative and that

25   the Board had refused to put the measure on the ballot.  Upon such a showing, SAFE was
     entitled to a writ of mandate commanding the Board to place the initiative on the ballot."

26   13 Cal.App.4th at 148-50 (citation omitted).

27       Plaintiffs in the present case have made precisely the showing demanded by the Court of Appeal
     in *Save Stanislaus*.  Plaintiffs are therefore *entitled* to the requested injunction commanding the Board of

28   Supervisors to submit the General Plan Amendment Initiative to the voters at the June 6, 2006, statewide
     primary election.

6

measure in writ of mandate action brought by initiative proponents "would be tantamount, in our opinion, to requiring every proponent of an initiative measure to first seek the advisory opinion of the courts as to its validity before getting the measure to the electorate").

The *Save Stanislaus* Court amplified on these concerns in another decision it issued two years later:

> "Our holding that a duly certified ballot measure should be presented to the voters unless there was a 'compelling showing' to the contrary was a pragmatic one.  Initiative and referendum measures usually arise from a controversial or unpopular local government action.  There is usually insufficient time for full appellate consideration of a ballot measure before the election.  As a result, the unilateral decision by local government officials to keep a measure off the ballot effectively may thwart the initiative/referendum process, unless trial courts vigilantly protect the process by allowing the election to go forward except when the invalidity of the measure is 'clear beyond a doubt.'" *Memorial Hospitals Ass'n v. Randol* (1995) 38 Cal.App.4th 1300, 1306, *quoting Gayle v. Hamm, supra*, 25 Cal.App.3d at 258.

In the present case, the Board of Supervisors has done exactly what the courts in *Save Stanislaus* and numerous other decisions over the past three-quarters of a century have admonished it ***cannot lawfully do***: It has arrogated to itself the judicial authority to determine the validity of the General Plan Amendment Initiative, and it has forced Plaintiffs to expend their limited resources to initiate and litigate this action on an urgent basis, placing the parties and this Court in the untenable position of having to brief and rule upon these issues in a severely truncated time frame, and effectively precluding any meaningful appellate review prior to the election.  The only way for this Court to now remedy the Board's violation of its ministerial duty and prevent it from successfully thwarting the initiative process is to order the election on the General Plan Amendment Initiative to go forward, and to let the Board or some other opponent of the Initiative file suit in *state court* to attempt to remove the Initiative from the ballot under the standards prescribed by the California Supreme Court for those seeking such extraordinary pre-election relief.

**II.    THE BOARD OF SUPERVISORS' PURPORTED CONCERNS OVER THE GENERAL PLAN AMENDMENT INITIATIVE'S VALIDITY DO NOT IN ANY EVENT PROVIDE GROUNDS FOR PRE-ELECTION JUDICIAL REVIEW AND WITHHOLDING OF THE INITIATIVE FROM THE**

7

1        **BALLOT**

2              The Board of Supervisors' unilateral refusal to place the General Plan Amendment Initiative on the

3        ballot based upon its purported "legal flaws" is all the more outrageous because, barely two weeks before

4        the Board's decision, the Supreme Court issued an opinion clarifying that the types of *substantive* defects

5        about which the Board majority complains ***do not even provide grounds for a pre-election legal***

6        ***challenge to the Initiative***, much less for the Board's unilateral and unlawful usurpation of judicial

7        authority.  The Supreme Court's decision likewise made clear that asserted *procedural* deficiencies in

8        initiative petitions constitute an insufficient basis to deny the electorate their constitutional right to vote on

9        a ballot measure as long as "the departure in question, *as a realistic and practical matter*, did not

10       undermine or frustrate the basic purposes served by the statutory requirements in ensuring the integrity of

11       the initiative or referendum process."  *Costa v. Superior Court, supra*, 39 Cal.Rptr. at 493 (emphasis

12       added).  A more restrictive standard, the Supreme Court explained, "would be inconsistent with the

13       fundamental nature of the people's constitutionally enshrined initiative power and with the well-established

14       'judicial policy to apply a liberal construction to this power whenever it is challenged in order that the right

15       be not improperly annulled.  *If doubts can reasonably be resolved in favor of the use of this reserve*

16       *power, courts will preserve it.*'"  *Id*. at 487 (emphasis added) (quoting *Associated Home Builders etc.*

17       *v. City of Livermore* (1976) 18 Cal.3d 582, 591).

18             In *Costa*, the Supreme Court reversed a decision by the Court of Appeal that had [temporarily]

19       removed Proposition 77 from the November 2005 special election ballot due to discrepancies between

20       the version of the measure that had been submitted to the Attorney General for title and summary and the

21       version that was circulated to the voters.[3]  Even though Proposition 77 was defeated at the polls, rendering

22

23             [3]Last August, just three days after the Court of Appeal had issued its ruling in the *Costa* case
         removing Proposition 77 from the ballot, the Supreme Court issued an order granting review and directing
24       the Secretary of State to place the initiative back on the ballot.  The Supreme Court then retained
         jurisdiction to determine whether it would issue a further ruling on the case after the election, which the
25       Court did last month.

26             Two weeks before issuing its order in *Costa*, the Supreme Court had issued a similar ruling in
         another case with regard to Proposition 80, which had also qualified for the November 2005 special
27       election ballot.  In that case, the Court of Appeal had concluded that the proposition was so "clearly
         invalid" that it should be removed from the ballot, finding that under the California Constitution, only the
28       Legislature — not the people by initiative — had the power to "confer additional authority and jurisdiction"

8

1    the legal challenge moot, the Supreme Court nevertheless issued an opinion specifically in order to clarify

2    when pre-election review of a legal challenge to an initiative measure is appropriate and what standard

3    should be applied in determining whether a claimed defect warrants withholding a measure from the ballot.

4    *Costa v. Superior Court, supra*, 39 Cal.Rptr.3d at 481.

5         In resolving these issues, the Supreme Court reiterated the longstanding principle that "it is usually

6    more appropriate to review constitutional and other challenges to ballot propositions or initiative measures

7    after an election rather than to disrupt the electoral process by preventing the exercise of the people's

8    franchise, in the absence of some clear showing of invalidity." *Ibid*. (quoting *Brosnahan v. Eu* (1982) 31

9    Cal.3d 1, 4.  The only exception to this rule against pre-election review, the Court explained, is when the

10   question is "whether the initiative measure has satisfied the constitutional or statutory procedural

11   prerequisites necessary to qualify it for the ballot." *Id*. at 482.  "Unlike a challenge to the substantive

12   validity of a proposed measure, it cannot properly be suggested that it would be premature to consider such

13   a claim prior to the election, because the focus of the issue is solely upon whether the measure has qualified

14   for the ballot, and not upon the validity or invalidity of the measure were it to be approved by the voters.

15   " *Ibid.*

16        Thus, the only types of challenges that are appropriate for pre-election review are those that relate

17   to the *procedural* sufficiency of an initiative — whether the measure has satisfied the requirements for

18   *qualifying* for the ballot in the first instance.  And in reviewing even these types of challenges, the Supreme

19   Court cautioned, courts must be especially solicitous of the people's reserved initiative power:

20        "Particularly when a preelection challenge is brought against an initiative measure that has

21        been signed by the requisite number of voters to qualify it for the ballot, the important state

22

23   _____

24   on the Public Utilities Commission, as Proposition 80 sought to do.  Pre-election review was therefore
     appropriate, the Court of Appeal held, because the challenge to the initiative questioned whether the
     electorate had the power to adopt the proposal in the first instance — that is, whether it was even a suitable

25   subject for exercise of the initiative power.  *See Independent Energy Producers Association v.
     McPherson* (2005) 131 Cal.App.4th 298, *rev. granted and opinion superseded by* 31 Cal.Rptr.3d 852

26   (No. S135819  July 27, 2005).  Just five days after the Court of Appeal issued its decision, however, the
     Supreme Court unanimously reversed and ordered Proposition 80 to be placed back on the ballot,

27   emphasizing that "it is usually more appropriate to review constitutional and other challenges to ballot
     propositions or initiative measures after an election rather than to disrupt the electoral process by preventing
     the exercise of people's franchise," and concluding that "the validity of Proposition 80 **need not and**

28   **should not** be determined prior to the November 8, 2005 election." *Ibid.*(emphasis added).

9

_____

*Melendez et al. v. Board of Supervisors et al.*
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF REQUEST FOR INJUNCTIVE RELIEF
Case No. C 06-1730 JW

interest in protecting the fundamental right of the people to propose statutory or constitutional changes through the initiative process requires that a court exercise considerable caution before intervening to remove or withhold the measure from an imminent election.  Only when a court is confident that the challenge is meritorious and justifies withholding the measure from the ballot, should a court take the dramatic step of ordering the removal of a measure that ostensibly has obtained a sufficient number of a qualified signatures.  (See, e.g., *Farley v. Healey* (1967) 67 Cal.2d 325, 327, 62 Cal.Rptr. 26, 431 P.2d 650 [court should order removal of an initiative measure from ballot only 'on a compelling showing that a proper case has been established for interfering with the initiative power']; *Zaremberg v. Superior Court* (2004) 115 Cal.App.4th 111, 116, 8 Cal.Rptr.3d 723 ['"[t]he ballot box is the sword of democracy.  A court will intervene in the . . . process only when there are clear, compelling reasons to do so"'].)"

*Costa, supra,* 39 Cal.Rptr. at 483.

In the present case, the Board of Supervisors made no findings and gave no reasons why it was refusing to submit the General Plan Amendment Initiative to the voters.[4]  However, the Board majority appears to have been referring to an analysis it had commissioned from the Nossaman law firm — the same firm that represents the Building Industry Association and many of the development interests opposed to the Initiative — which concluded that the Initiative "may be invalid" on nine different grounds, almost all of which relate to alleged *substantive* flaws in the Initiative.  These types of complaints, the Supreme Court held in *Costa*, are not appropriate for pre-election judicial review and must be raised, if at all, only after the election on the Initiative has been held.  They certainly provided no lawful basis for the Board of Supervisors to refuse to submit the measure to the voters in the first instance.

Likewise, the Board's *procedural* objections provided no legitimate grounds for its refusal to place the Initiative on the ballot.  The General Plan Amendment Initiative was determined to be procedurally sufficient by Monterey County Registrar of Voters Tony Anchundo, who duly — and rightly — certified

---

[4]One Supervisor recited his substantive objections to the proposed amendments and then the Board quickly voted, three to two, ***not*** to place the measure on the June ballot "because of the serious flaws that are apparent in this initiative."

10

1    the sufficiency of the Initiative for the ballot on January 26, 2006.  As the Registrar of Voters, Respondent

2    Anchundo is the county elections official with the legal responsibility and obligation to ensure that initiative

3    and referendum petitions comply with all constitutional and statutory requirements.  *See, e.g.*, *Billig v.*

4    *Voges* (1990) 223 Cal.App.3d 962, 969 ("the offices of city clerks throughout the state are mandated by

5    the constitution to implement and enforce the statute's procedural requirements").  The Board of

6    Supervisors has no role to play in that process and has no authority to make its own, unilateral

7    determination to "overrule" the Registrar's certification of the initiative on procedural grounds.  To the

8    contrary, as we have demonstrated above, upon receiving the Registrar's certification, the Board had a

9    *ministerial obligation* to submit the Initiative to the voters at the June 6, 2006, primary election.

10        Because the Board of Supervisors did not specify on what legal basis it was refusing to place the

11   General Plan Amendment Initiative on the ballot — and because the Supreme Court's decision in *Costa*

12   made it clear that alleged substantive flaws do not provide legal grounds for withholding an initiative from

13   the ballot — Plaintiffs will not attempt to anticipate the Board's proffered defense in this action and will

14   have to await receipt of Defendants' brief to respond to any of the substantive invalidity arguments raised

15   therein.  It suffices to emphasize at this point, however, that if the Board intends to rely upon the same

16   issues noted in the Nossaman analysis as possible flaws in the Initiative, they fall woefully short of

17   establishing the "compelling showing of invalidity" that the courts demand before withholding a qualified

18   initiative measure from the ballot.

19   **III.    NO COURT HAS EVER HELD THAT THE FEDERAL VOTING RIGHTS ACT REQUIRES**

20   **PLAINTIFFS' PRIVATELY CIRCULATED INITIATIVE PETITIONS TO BE PRINTED IN
     SPANISH. IN FACT, THE COURTS OF APPEALS IN TWO CIRCUITS HAVE SPECIFICALLY**

21   **REJECTED JUST SUCH AN ARGUMENT.**

22        In their Notice of Removal, Defendants assert that they "refused to place the Initiative on the

23   upcoming ballot, because to do so would have been inconsistent with the provisions of [the Federal Voting

24   Rights Act of 1965 ('FVRA')], and *might have* rendered the County defendants in violation of FVRA."

25   Notice of Removal, ¶ 4 (emphasis added).  Specifically, Defendants contend that under the Ninth Circuit's

26   recent decision in *Padilla v. Lever*, "the measure *apparently* violates" Section 203 of FVRA, 42 U.S.C.

27   § 1973aa-1a, because the initiative petitions that Plaintiffs circulated among the County's voters were not

28   translated into Spanish.  *Ibid.* (emphasis added).

11

There is every reason to believe that Defendants' new-found reliance upon the Voting Rights Act is merely a pretext to conceal their true motivation for refusing to submit the General Plan Amendment Initiative to the voters — that a majority of the Board opposes the *substance* of the proposed Initiative. Despite the statement in Defendants' Notice of Removal that the asserted FVRA concern was "one of the primary reasons" why the Board refused to place the duly certified initiative on the ballot, *not a single word* about the alleged FVRA violations was mentioned by any of the Supervisors as a purported ground for refusing to submit the Initiative to the voters; instead, all of the Supervisors' stated objections focused entirely on the Initiative's substantive provisions.[5]  Moreover, just one month before refusing to place the General Plan Amendment Initiative on the ballot on the alleged ground that doing so would violate the FVRA, the Board of Supervisors voted — without any concern for compliance with the FVRA — to place a referendum measure on the same June 6 ballot even though its petitions had likewise been printed and circulated only in English.  *See* Declaration of Fredric D. Woocher in Support of Ex Parte Application for TRO and OSC Re: Preliminary Injunction, ¶ 5.

Nevertheless, the plaintiffs in the now-consolidated *Madrigal v. County of Monterey* case have squarely raised the issue of whether the General Plan Amendment Initiative petitions violated the FVRA, so the issue is properly before this Court.  There is, however, no merit to the contention that privately circulated *initiative* petitions — as opposed to *recall* petitions — must all be printed in the applicable minority languages under the Voting Rights Act, much less that the failure of the Initiative petitions in this case to have been printed in Spanish requires that the election on the Initiative — which will be conducted bilingually in full compliance with the FVRA — cannot legally go forward.

A.    **The Ninth Circuit's Decision in *Padilla v. Lever* by Its Terms Applied Only**

---

[5]Significantly, the Nossaman analysis gave rather short shrift to the Voting Rights Act claim, recognizing that it would take a considerable *extension* of the panel's decision in *Padilla* to apply the ruling in that case to cover the General Plan Amendment Initiative.  The Nossaman analysis explained:

"Also, there is a case in the federal Court of Appeals (*Padilla v. Lever*, 429 F.3d 910 (9th Cir. 2005)) which addressed a recall process that may have the effect of applying its holding to this Initiative even though the Initiative process was begun before the initial ruling by the federal Court of Appeals.  *At its furthest reach*, if the Court of Appeals were to hold (1) that the requirement to circulate election documents in more than one language is required of Initiatives as well as recalls and (2) that the decision is not new law, but was the pre-existing law, then it would apply to the Initiative here which had already been circulated."  (Emphasis added.)

1

2

**to Recall Petitions and Specifically Distinguished the Recall Process in California from the Initiative Process**

3

4

The *Madrigal* plaintiffs' Voting Rights Act claim is brought pursuant to Section 203 of the Act, 42 U.S.C. § 1973aa-1a.  Section 203, subdivision (c), of the FVRA provides in pertinent part:

5

6

7

8

9

"Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language."  42 U.S.C. § 1973aa-1a(c).

10

11

12

13

14

15

16

17

18

19

20

21

22

This "language minority" provision of the FVRA applies much more broadly geographically than the "covered" jurisdictions under the pre-clearance provisions of the Act.  Section 203's provisions generally apply to any state or political subdivision in which five percent or more of the voters are members of a single language minority, and the illiteracy rate among this group is higher than the national average. Thus, whereas Monterey County is the only covered "pre-clearance" county in California, almost half of California's counties — including all of the most populated jurisdictions (e.g., Los Angeles, Alameda, San Diego, Santa Clara, Orange, San Francisco) — are subject to Section 203, and in several of these counties, registration and voting materials must be provided in ***multiple*** foreign languages; in Los Angeles County, for example, there are *five language minorities*: Spanish, Chinese, Filipino, Japanese, and Vietnamese.  *See* 28 C.F.R. Part 55 [Appendix] (listing jurisdictions covered under Section 203(c) and the applicable language minority groups).  As the statutory language quoted above makes clear, however, the FVRA's multilingual requirements apply only where: (1) the State or a political subdivision "provides" voting notices or other materials or information; and (2) those materials "relat[e] to the electoral process."

23

24

25

26

27

28

In *Padilla v. Lever*, a divided panel of the Ninth Circuit Court of Appeals ruled that privately circulated ***recall petitions*** are subject to Section 203(c) of the Voting Rights Act.  *See Padilla*, 429 F.3d at 915 ("the central dispute is whether *recall petitions* fall under the Act's translation requirements") (emphasis added).  As this Court is apparently aware, the mandate in *Padilla* has not yet issued because petitions for rehearing and for rehearing en banc are still pending before the panel and the full Ninth Circuit. Indeed, the Court called for a response to the petition for rehearing en banc almost three months ago, a

13

1  necessary step before either petition for rehearing can be granted.  It is thus not clear at this time whether

2  the panel's decision will withstand review by the full Court — or, for that matter, by the U.S. Supreme

3  Court — especially since the petition for rehearing en banc was supported by *amicus curiae* letters from,

4  among others, the Secretaries of States of California, Nevada, Arizona, and Washington, as well as the

5  California State Association of Counties.  *See* Declaration of Fredric D. Woocher in Support of Ex Parte

6  Application for TRO and OSC Re: Preliminary Injunction., Exhs. 6-9.

7       Even if *Padilla* were to remain good law in this Circuit, however, nothing in that opinion justifies

8  expanding the *Padilla* majority's holding or reasoning to require that ***initiative petitions*** must also be

9  translated into multiple languages, much less that initiative petitions circulated ***prior to the issuance of the***

10  **Padilla** ***opinion*** must be invalidated for violating the FVRA.  To the contrary, both the majority opinion

11  and the plaintiffs in the *Padilla* case — represented by the same counsel who now represents the plaintiffs

12  in *Madrigal* — were careful to ***distinguish*** the recall process in California from the initiative process in

13  this state and elsewhere.

14       The majority opinion in *Padilla* held that recall petitions fell within the ambit of Section 203(c) —

15  which, as noted above, only applies to election materials that are "provided" by the state — because,

16  ***unlike the initiative process***, the recall process under the California Elections Code involves significant

17  state involvement.  *Padilla*, 429 F.3d at 922 ("Recall petitions in California are subject to extensive

18  regulations that go beyond imposing mere ministerial duties upon elections officials.  *See* Cal. Elec. Code

19  § 11000 et seq.").  Specifically, elections officials are required to review ***and approve*** recall petitions ***prior***

20  ***to*** their circulation.  As the court explained, "California law prohibits *any* private party from circulating a

21  recall petition until the petition receives state approval. . . . By reviewing and approving the Recall Petition

22  for circulation, the Orange County Elections Department officially sanctioned the content and format of the

23  petition, including its printing only in English.  Elections officials could have altered the text of the petition

24  or demanded that the Recall Proponents publish it in Spanish as well as English, but chose not to do this

25  and instead approved the petitions in their English-only form."  *Id.* at 923-24; *see* Cal. Elec. Code, §

26  11042(a) (charging elections officials with "ascertain[ing] if the proposed form and wording of the petition

27  meets the requirements of this chapter"); *id.*, § 11042(d) ("No signature may be affixed to a recall petition

28  until the elections official . . . has notified the proponents that the form and wording of the proposed petition

14

1    meet the requirements of this chapter."). "This state approval," the *Padilla* panel believed, constituted

2    "sufficient state involvement to trigger application of the bilingual requirements and to conclude that the state

3    'provided' the Recall Petition within the meaning of the Voting Rights Act." 429 F.3d at 924.

4        By contrast, state regulation of ***initiative petitions*** is minimal. In particular, there is no review

5    and approval by the state of the form or content of an initiative petition ***prior*** to its circulation. The

6    elections official has neither the authority nor the opportunity to alter the text of an initiative petition or to

7    demand that it be published in any language other than English. Indeed, the first time an elections official

8    ever ***sees*** an initiative petition is ***after*** it has been privately circulated and it has been submitted for

9    verification of the signatures on it. *See generally* Cal. Elec. Code, § 9100 et seq. And at that point, the

10   role of the elections official is purely ***ministerial***, limited to determining the petition's compliance with the

11   ***procedural*** requirements of the Code. *See Alliance for a Better Downtown Millbrae v. Wade* (2003)

12   108 Cal.App.4th 123 (elections officials are foreclosed from making "decisions that are discretionary or

13   go beyond a straightforward comparison of the submitted petition with the statutory requirements for

14   petitions"); *Ley v. Dominguez* (1931) 212 Cal. 587, 602 ("duties and powers of the city clerk in reference

15   to his examination of referendum petitions . . . are purely ministerial and not judicial"). In sum, California

16   elections officials do not initiate the petition process, do not draft the language of an initiative petition, do

17   not review, approve, or alter the substance of the petition, and do not play any role in circulating an initiative

18   petition to the voters. There is simply no way that the state could be considered to "provide" the initiative

19   petition so as to bring it within the coverage of Section 203 of the FVRA.[6]

20

21        [6]There are many other factors that distinguish initiative petitions from recall petitions as they might

22   relate to the FVRA analysis. For instance, whereas recall petitions are statutorily limited to including a
     [maximum] 200-word statement of the reasons for the proposed recall and a [maximum] 200-word answer

23   from the elected official who is the subject of the proposed recall, initiative petitions must include the "full
     text" of the measure that is proposed to be enacted and will therefore be quite voluminous. The General

24   Plan Amendment Initiative in this case, for example, consisted of some 60 pages of 8 ½ x 14 inch text, plus
     19 separate charts and maps. To require private parties to have to pay the costs of translating and printing

25   initiative petitions into sometimes-multiple foreign languages would severely chill, if not entirely thwart, their
     fundamental constitutional right to petition their government for redress of grievances. When Congress

26   mandated in Section 203 that "[w]henever *any State or political subdivision . . . provides* any registration
     or voting notices . . . or other materials or information relating to the electoral process, including ballots,

27   ***it shall provide them*** in the language of the applicable minority group as well as in the English language,"
     it surely did not contemplate that private citizens would be forced thereby to expend tens of thousands of

28   dollars in order to exercise their constitutional right of petition.

15

**B.     The Only Judicial Decisions to Have Addressed Whether Section 203 of the Voting Rights Act Applies to Initiative Petitions Have Held That Initiative Petitions Are Not Covered by the Act**

In fact, the only two Courts of Appeals to have considered whether *initiative petitions* are subject to Section 203(c) of the FVRA have held that initiative petitions *are not subject* to the language minority provisions of the Act.  In *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988) and *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988), both the Tenth Circuit and the Eleventh Circuit Courts of Appeals specifically held that citizen-sponsored initiative petitions *did not* have to be printed and circulated in languages other than English because they were neither "materials relating to the electoral process," nor were they "provided" by the state.[7]  The courts in these cases emphasized that in reviewing the initiative petitions for compliance with certain statutory requirements regarding the permissible form (and in some respects, such as with single-subject rule compliance, the content) of the petitions, the elections officials were performing a ministerial function that did not convert the private actions of the initiative proponents into state action.  *See Montero v. Meyer*, 861 F.2d at p. 610 ("The acts performed by those officers are designed primarily to make the initiative process fair and impartial, and do not constitute providing the petitions to the electorate."); *Delgado v. Smith*, 861 F.2d at 1496 ("the Florida Secretary of State is charged with limited ministerial duties regarding the initiative process.  As discussed above, the Secretary must determine whether the total number and geographic distribution of petitions is proper, approve the format of the petition, and finally submit it to the Attorney General of Florida certifying that the formal

---

Another critical distinction between recall petitions and initiative petitions is that recall petitions, if certified to have a sufficient number of signatures thereon, always and inevitably lead to an *election* on the recall.  Initiative petitions, by contrast, only trigger the governing body's obligation either to adopt the proposed measure or to submit it to a vote of the people; in many instances, the governing body finds it more expedient simply to adopt the measure (or, in the case of a referendum, to repeal the challenged measure) rather than incur the expense of an election.  It is therefore problematic to consider an initiative or referendum petition to be the equivalent of a voting notice or other "materials relating to the electoral process" when it may not result in an election at all.

[7]Both courts also expressed the view that an interpretation of the FVRA that required initiative petitions to be printed in multiple languages would raise serious concerns under the First Amendment by imposing "a substantial burden on the right of political association." *Delgado v. Smith*, 861 F.2d at 1494-95 ("It is hard to imagine that in passing the Act, Congress could have intended that private citizens seeking to further their own political goals through the initiative petition process be subject to specific language requirements."); *see also Montero v. Meyer*, 861 F.2d at 609 ("so long as the right of initiative remains reserved to the people, the state cannot diminish or impede that process").

16

petition requirements have been complied with.  However, contrary to appellants' position, these duties do not constitute state formulation of the initiative petition.")  As the Court of Appeals summarized Florida's initiative process in *Delgado v. Smith*:

> "No state action link exists between the proponents of the English language petition and the state statutory scheme.  The state does not initiate the petition, does not draft the language of the petition, does not address the merits of the proposal and does not participate in any way in the circulation of the petition or in the collection of signatures.  Rather, all of this action is taken by private citizens.  The state's responsibility is to ensure that the petition meets the requirements of law and will fairly present the proposition that may or may not be placed before the electorate.  Such regulation is not sufficient to transpose such private conduct into state action." *Id.* at 1497.

Similarly, California's statutory scheme for the initiative process provides for minimal state involvement.  Like Florida and Colorado, California law does not require elections officials to review and approve the **content** of an initiative petition — a fact the *Padilla* court deemed particularly significant in distinguishing California's recall process, which the court found to require state review and approval of the content of the petition, from Florida's and Colorado's initiative processes.  Florida elections officials review and approve an initiative petition before circulation for "sufficiency of the **format only**," but do not consider the substance of the initiative.  Fla. Admin. Code Ann. R. 1S-2.009(1) (emphasis added).[8]  And although elections officials in Colorado review an initiative petition and may propose "suggested editorial changes," those changes are purely voluntary and need not be made by the proponents in order to circulate the petition.  Colo. Rev. Stat. § 1-40-105(1).[9]  As discussed above, in California, elections officials do not even review an initiative petition at all before it is circulated, much less propose editorial changes.

California law is also similar to Colorado's initiative process in that both impose upon officials certain "regulatory" duties that are designed to make the initiative process fair and impartial.  *See Montero*,

---

[8]For the Court's convenience, a copy of Florida Admin. Code Ann. R. 1S-2.009 is attached as Exhibit B to the accompanying Declaration of Fredric D. Woocher in Support of Request for Injunctive Relief.

[9]For the Court's convenience, a copy of Colorado Rev. Stat. § 1-40-105 is attached as Exhibit D to the accompanying Declaration of Fredric D. Woocher in Support of Request for Injunctive Relief.

17

861 F.2d at 609-10 ("The acts performed by [elections] officers are designed primarily to make the initiative process fair and impartial."). For example, under Colorado law, election officials designate and fix a "proper fair title" and a "submissions clause" to a proposed law (Colo. Rev. Stat. § 1-40-106(1);[10] *see also Montero*, 861 F.2d at 610 n.5); in California, election officials are similarly limited to creating a ballot title and summary for a proposed measure (Cal. Elec. Code § 9105).

In fact, in many respects, the duties imposed upon Florida and Colorado officials — which the courts in *Delgado* and *Montero* found **insufficient** to create the necessary state action under the FVRA — *exceed* those of California officials. For instance, upon receipt of an initiative petition, the Florida Attorney General must petition the Secretary of State or the Florida Supreme Court for an advisory opinion on whether the proposed initiative conforms to Florida law. Fla. Stat. § 16.061(1);[11] *Delgado*, 861 F.2d at 1491. California law has no analogous requirement.

The Ninth Circuit panel in *Padilla* relied upon these same differences between the initiative processes in Florida and Colorado and the recall scheme in California to distinguish the *Montero* and *Delgado* decisions. *See Padilla*, 429 F.3d at 917-18 ("For instance, under Florida law, Florida elections officials are limited to verifying only that a proposed initiative petition complies with applicable format requirements; the regulations do not provide for a review of the petition's contents. . . . Unlike Colorado, California recall proponents are statutorily required to alter their recall petition as directed by elections officials until elections officials are satisfied that no further alterations are required."). The plaintiffs in *Padilla*, represented by the same attorney who now represents the *Madrigal* plaintiffs here, likewise stressed that the different statutory frameworks were critical in determining whether the requisite degree of state involvement existed to support a conclusion that the state "provides" the election materials under the FVRA: "If election officials in Florida and Colorado do not have the ultimate determination to require changes to the content of a petition, then for all practical purposes, the states are not providing any election materials and are instead performing ministerial duties in the conduct of elections." Plaintiffs-Appellants'

---

[10]For the Court's convenience, a copy of Colorado Rev. Stat. § 1-40-106 is attached as Exhibit E to the accompanying Declaration of Fredric D. Woocher in Support of Request for Injunctive Relief.

[11]For the Court's convenience, a copy of Florida Stat. § 16.061 is attached as Exhibit C to the accompanying Declaration of Fredric D. Woocher in Support of Request for Injunctive Relief.

18

1   Response to Petition for Rehearing en Banc in *Padilla v. Lever*, pp. 7-8 (attached as Exhibit 10 to the

2   Declaration of Fredric D. Woocher in Support of Plaintiffs' Ex Parte Application for TRO and OSC Re:

3   Preliminary Injunction). Just as the privately circulated initiative petitions in Colorado and Florida were held

4   not to be "provided" by the state in *Montero* and *Delgado*, Plaintiffs' Initiative here was not "provided"

5   by the County, either.

C.   **The Panel's Decision in *Padilla* Does Not Require or Justify Invalidating
6        the General Plan Amendment Initiative Petitions in This Case and
7        Preventing an Election from Being Held on the Initiative in Full
8        Compliance with the Voting Rights Act**

9          Even if it were appropriate to extend *Padilla*'s  newly announced interpretation of the FVRA to

10   cover *initiative* petitions — notwithstanding the majority's deliberate effort to limit its ruling to *recall*

11   petitions and notwithstanding the contrary decisions in *Montero* and *Delgado* — there is no reason to

12   apply *Padilla* *retroactively* so as to invalidate initiative petitions, such as the General Plan Amendment

13   Initiative petition in this case, that were circulated in good faith prior to the issuance of the panel's decision

14   on November 23, 2005. *Padilla* set forth a new interpretation of the Voting Rights Act — to be applied

15   prospectively to future recall petitions — but said nothing about the remedy that should be applied to recall

16   petitions (much less initiative and referendum petitions) that had already been circulated prior to the

17   issuance of the decision. Indeed, the Court of Appeal in *Padilla* itself had refused the plaintiffs' request

18   for an injunction to enjoin the recall election in that case based upon the proponents' failure to have printed

19   and circulated the petitions in Spanish. *See* 429 F.3d at 914 n.4. There is nothing in either the Voting

20   Rights Act or the *Padilla* ruling that would require the disqualification of the Initiative petitions in this case

21   and prohibit an election from being held on the proposed measure.

22          When, as happened in *Padilla*, a new rule is *not* applied in the very case in which it is announced,

23   courts may — and should — properly refuse to apply it retroactively. *See George v. Camacho*, 119 F.3d

24   1393, 1399 n.9 (9th Cir. 1997) (a new rule must be applied to pending cases only "if the new rule is

25   applied in the case in which it was announced"). Rather, courts will refuse to apply decisions retroactively

26   when: (1) the decision establishes a new principle of law; (2) the retroactive application of the decision will

27   retard, not further, the purposes of the rule in question; and/or (3) the retroactive application of the decision

28   will produce substantially inequitable results. *Id.* at 1401; *accord, Austin v. City of Bisbee, Arizona*, 855

19

1    F.2d 1429, 1432-43 (9th Cir. 1988).

2           Here, all three factors mandate that the *Padilla* decision ***not*** be applied retroactively.   First, the

3    decision not only established a new rule, it actually *reversed* a prior one.   The Courts of Appeals in

4    *Montero* and *Delgado* had expressly rejected claims that citizen-sponsored initiative petitions must comply

5    with the minority language requirements of the FVRA, and even the District Court in *Padilla* had likewise

6    ruled *almost three years ago* that recall petitions in California do not have to be printed in multiple

7    languages.   Although the Ninth Circuit panel opinion subsequently reversed the District Court's ruling,

8    surely those citizens in California who — like Plaintiffs here — had relied in good faith upon these previous

9    rulings to circulate their initiative petitions only in English should not now have the thousands of signatures

10   they gathered invalidated and the elections they petitioned for canceled because they did not have the

11   foresight to predict the panel majority's decision.   *See, e.g., Austin v. City of Bisbee, Arizona, supra,* 855

12   F.2d at 1433 (refusing to apply new decision retroactively where it "overruled clear past precedent").

13          Similarly, the purpose of the rule in question — to promote "full participation in the electoral

14   process" (*see Padilla,* 429 F.3d at 924) — would be retarded, not furthered, by invalidating the Initiative

15   petition in this case.   *Every one of the more than 15,000 persons who signed that petition did so*

16   *precisely because they wanted to participate in the electoral process by exercising their*

17   *constitutionally protected right of initiative.*   Even if it were the case that *more citizens* (i.e., language

18   minority speakers) would be able to fully participate in the electoral process if, *in the future*, recall and

19   other petitions were printed in multiple languages, that is no reason to nullify the petitions that have already

20   been circulated and qualified for the ballot even without these additional individuals' full participation.   The

21   retroactive application of *Padilla*'s new rule to this Initiative would serve only to deny those who have

22   already signed the petitions their fundamental constitutional rights and frustrate their efforts to participate

23   in the electoral process.

24          Finally, applying the *Padilla* decision retroactively would produce substantially inequitable results.

25   Plaintiffs reasonably relied upon the California Elections Code, the appellate decisions in *Montero* and

26   *Delgado*, and the District Court's ruling in *Padilla* itself in drafting and circulating their initiative petitions

27   in English only.   Countless initiative petitions have circulated and qualified for the ballot throughout the State

28   of California that were printed only in English, and ***never before had a single one of them been declared***

1  *unlawful under the FVRA*.  Indeed, on the same June 2006 primary ballot on which Plaintiffs' General

2  Plan Amendment Initiative should be appearing will be Proposition 82, which was circulated in English only,

3  and 53 other statewide initiative petitions have been submitted or are in circulation with the hope of

4  appearing on the November 2006 ballot (*see* <http://www.ss.ca.gov/elections/elections_j.htm>) — every

5  one of which is printed only in English.  To suddenly change the "rules of the game" now, after Plaintiffs

6  have completed the process and have done exactly what had been required of them to qualify their initiative

7  for the ballot, would "penaliz[e] [those] parties who ordered their affairs in reasonable reliance on a rule

8  of law that was later invalidated."  *Austin*, 855 F.2d at 1432.[12]

9          In sum, if this Court were to accept the *Madrigal* plaintiffs' argument, ***it would be the first court***

10  ***in the country*** to hold that initiative petitions must be printed and circulated in the applicable language

11  minorities under Section 203 of the Voting Rights Act.  Such a ruling would throw the initiative process into

12  ***utter chaos*** throughout the state, affecting scores of pending statewide and local initiatives and, in many

13  cases, rendering this vital grass-roots tool of the democracy completely unavailable, as those with limited

14  financial resources find themselves unable to afford the exorbitant cost of translating and printing lengthy

15  initiatives into as many as five different languages.  If a court is to issue such a momentous and

16  unprecedented decision, it should at least result from a deliberative process that allows for the careful

17  consideration of opposing arguments and authorities, not from the rushed consideration that has been

18  occasioned in this case by the Board of Supervisors' unlawful refusal to place this Initiative on the ballot

19  and the *Madrigal* plaintiffs' eleventh-hour challenge to the petitions.  And such a decision should flow

20  ineluctably from established appellate rulings, not from a two-to-one panel decision in a case awaiting en

21  banc review in the context of a completely different type of petition and in the face of not one, but two,

22

23

24  _____

25          [12]It should be noted that Monterey County Registrar of Voters Tony Anchundo certified the
   sufficiency of the General Plan Amendment Initiative back almost eight weeks ago, back on January 26,

26  2006. The *Madrigal* plaintiffs, who admit they were well aware of that the Initiative petitions were printed
   in English only while they were being circulated, should have challenged the validity of the petitions at that

27  point, rather than waiting until the eve of the election, when there is insufficient time for careful consideration
   of the important issues raised by their claims.  For this reason alone, the *Madrigal* plaintiffs should be

28  denied the injunctive relief they belatedly seek prohibiting an election on the General Plan Amendment
   Initiative.

1   Court of Appeals decisions that hold directly to the contrary.[13]

2   **CONCLUSION**

3       Over 15,000 Monterey County residents signed the General Plan Amendment Initiative petition,

4   and tens of thousands more support the demand for a vote on the Initiative.  If the Initiative is prevented

5   from appearing on the June ballot, these residents and the public interest will be irreparably harmed by the

6   denial of their First Amendment right to petition their government and by the deprivation of their right to

7   have a meaningful say on the most important land-use and quality-of-life issues facing their community.  By

8   contrast, even if the Court were to conclude that the Initiative petitions should have been printed in Spanish

9   as well as English, there will be no harm from allowing the election on the measure to proceed, because (1)

10  nobody has ever credibly suggested that the Initiative would not have qualified for the ballot if the petitions

11  had *also* been printed in Spanish, and (2) the ballots and all of the other election materials that will be

12  provided to the voters in connection with the June election *will be available* in both Spanish and English.

13

14

15

16

17

18

19

20

21

22

23      [13]Defendants' half-hearted suggestion that the Board also refused to submit the Initiative to the voters because doing so "might have placed the County Defendants in violation of the pre-clearance

24  provisions of FVRA" (Notice of Removal, ¶ 5) is equally without merit.  The Supreme Court has held that "a covered jurisdiction need not seek preclearance before *enacting* legislation that would effect a voting

25  change.  Preclearance is required before actually *administering* a change . . . ."  *Lopez v. Monterey County*, 525 U.S. 266, 279 (1999) (internal citations omitted; emphasis in original); *see also* 28 C.F.R.

26  § 51.21 ("Changes affecting voting should be submitted as soon as possible *after* they become final.") (emphasis added).  Accordingly, the County of Monterey need not seek pre-clearance unless and until the

27  General Plan Amendment Initiative is approved by voters.  More fundamentally, even if enacted by the voters, the Initiative would not effect a change to a "standard, practice, or procedure with respect to

28  voting," and would therefore not trigger the pre-clearance requirements of the Voting Rights Act in any event.

DATE: March 17, 2006

Respectfully Submitted,

STRUMWASSER & WOOCHER LLP
Fredric D. Woocher
Michael J. Strumwasser

LAW OFFICE OF J. WILLIAM YEATES
J. William Yeates
Keith G. Wagner
Jason R. Flanders

By _____/ s /_____
                    Fredric D. Woocher

*Attorneys for Petitioners and Plaintiffs*
*William Melendez, Ken Gray, Jyl Lutes,*
*Carolyn Anderson, and Landwatch Monterey*

23