United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

In re County of Monterey Initiative Matter,

In re Monterey Referendum.

NO. C 06-01407 JW
NO. C 06-01730 JW
NO. C 06-02202 JW
NO. C 06-02369 JW

**ORDER DENYING RANGEL PLAINTIFFS' REQUEST FOR THE CONVENING OF A THREE JUDGE COURT; GRANTING THE MELENDEZ AND THE RANCHO SAN JUAN OPPOSITION COALITION PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND ORDERING THE COUNTY OF MONTEREY TO SUBMIT THE INITIATIVE AND REFERENDUM TO VOTERS OF MONTEREY COUNTY AT THE JUNE 5, 2007 COUNTY ELECTION**

## I. INTRODUCTION

Monterey County is subject to the federal Voting Rights Act of 1965, 42 U.S.C. §§ 1973 et seq. Under the Act, whenever Monterey County provides voting materials it must do so in English and Spanish. These consolidated cases involve citizen-sponsored petitions and materials which were approved by the County for circulation to see if the required number of signatures of registered voters could be obtained. The petitions and associated materials were in English only. On cross-motions for summary judgment, the Court is asked to decide whether as a matter of law, English-only citizen-sponsored petitions and materials in Monterey County are unlawful under the Voting Rights Act.

Based on the *en banc* ruling in Padilla v. Lever, 463 F.3d 1046 (9th Cir. 2006), the Court finds that citizen-sponsored petitions in Monterey County are not required to be in Spanish and English.  Consequently, the motion for summary judgment should be granted ordering the County of Monterey to submit (1) the Monterey County Quality of Life, Affordable Housing, and Voter Control Initiative and (2) the Referendum Against Resolution No. 05-305, in their entirety and without alteration to the voters of Monterey County at the June 5, 2007 county election.

## II.  BACKGROUND

This action involves two sets of consolidated cases:

(A) Rosario Madrigal, et al., v. The County of Monterey, et al., C 06-01407 JW and William Melendez, et al., v. Board of Supervisors of the County of Monterey, et al., C 06–1730 consolidated as **"*In re County of Monterey Initiative Matter.*"**

(B) Sabas Rangel, et al., v. County of Monterey, et al., C 06-02202 JW and Rancho San Juan Opposition Coalition, et al., v. Board of Supervisors of the County of Monterey, et al., C 06-02369 consolidated as **"*In re Monterey Referendum.*"**

The material facts in each of the consolidated cases are not in dispute.[1]  The Court summarizes the relevant facts in each of the consolidated cases for the purposes of this Order:

### A.  *In re County of Monterey Initiative Matter*

A group of citizens in Monterey County circulated an initiative petition (the "Initiative") which, if passed, would amend certain zoning and land development provisions of the Monterey County General Plan and would require a public election for future zoning changes.

In January of 2006, the proponents of the Initiative filed a notice of their intent to circulate the petition and a copy of the proposed Initiative with the County Elections Department.  The County approved the form and content of the petition for circulation among voters and provided the

---

[1] The facts here are summarized from the Court's March 23, 2006 Order Re: Motion for Injunctive Relief and Declaratory Judgments (See Docket Item No. 26, C 06-01407) and August 15, 2006 Order Denying [Rancho] Plaintiffs' Motion for a Preliminary Injunction and Staying Action. (See Docket Item No. 34, C 06-02369.)

2

1  approved petition, Title and Summary materials to the proponents for publication in a newspaper
2  and for circulation to registered voters. All of these materials were only printed in English.
3  　　　On February 24, 2006, a group of Spanish-speaking citizens (the "Madrigal Plaintiffs") filed
4  a lawsuit against Monterey County in this Court. The Madrigal Plaintiffs asked for a declaratory
5  judgment that the English-only materials violated the Voting Rights Act. The Madrigal Plaintiffs
6  requested an injunction against further processing of the Initiative.
7  　　　On February 28, 2006, after receiving a legal report addressing procedural and substantive
8  concerns with respect to the content and form of the Initiative under both federal and California law,
9  including the lack of English and Spanish materials, the Board of Supervisors voted not to place the
10  Initiative on the ballot.
11  　　　On March 1, 2006, the proponents of the initiative (the "Melendez Plaintiffs") filed a
12  mandamus action in the Superior Court of the County of Monterey to compel the County to place the
13  Initiative on the ballot. Since the requisite number of qualified signatures had been obtained, the
14  Melendez Plaintiffs alleged that the County had a ministerial duty to place the Initiative on the
15  ballot. On March 7, 2006, Monterey County removed the Melendez action to this Court citing as a
16  basis of subject matter jurisdiction 28 U.S.C. § 1443(2), alleging that it refused to place the Initiative
17  on the ballot because the Initiative was inconsistent with the Voting Rights Act.
18  **B.**     ***In re Monterey Referendum***
19  　　　On November 7, 2005, the Monterey County Board of Supervisors ("Board") passed a
20  resolution to amend certain provisions of the Monterey County General Plan, the Greater Salinas
21  Area Land Use Plan, and the Rancho San Juan Area of Development Concentration Development
22  Guidelines and Principles ("Resolution"). The Plaintiffs in the Rancho San Juan Opposition
23  Coalition action ("Rancho Plaintiffs") began circulating a referendum against the Board's
24  Resolution ("Referendum"). The Referendum materials were only printed in English.
25  　　　The Board initially ordered that the Referendum be placed on the June 2006 ballot. In
26  response, on March 27, 2006, Plaintiffs Sabas Rangel and Maria Buell (collectively, the "Rangel
27  Plaintiffs") filed this in the Northern District of California. The Rangel Plaintiffs seek, *inter alia*, a

3

declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the Referendum is invalid under Section 203 of the Voting Rights Act because it was printed and circulated only in English.

On March 28, 2006, the Board withdrew the Referendum from the June ballot, citing the Ninth Circuit's initial decision in <u>Padilla v. Lever</u>, 429 F.3d 910 (9th Cir. 2005), <u>opinion withdrawn</u>, 446 F.3d 963 (2006). On April 3, 2006, the <u>Rancho</u> action was filed seeking declaratory and injunctive relief to compel the Board to put the Referendum to voters at the next election. On August 15, 2006, the Court stayed the action pending the Ninth Circuit's *en banc* review of the panel's decision in <u>Padilla</u>.

## C. **Procedural History**

The Court consolidated the two suits as "*In re Initiative Matter.*" On March 23, 2006, pursuant to the holding of <u>Padilla v. Lever</u>, 429 F.3d 910 (9th Cir. 2005), <u>opinion withdrawn</u>, 446 F.3d 963 (2006), the Court permanently enjoined the County for processing, certifying or adopting the Initiative and from placing it on a ballot for a future County election unless or until first properly circulating it in compliance with the Voting Rights Act. (<u>See</u> Docket Item No. 26, 06-01470.)

The <u>Melendez</u> and <u>Rancho</u> Plaintiffs appealed the Court's Orders enjoining the County from placing the Initiative and the Referendum on the ballot.

In September of 2006, the Ninth Circuit issued its *en banc* ruling in <u>Padilla</u>. Following this ruling, all parties to this litigation filed cross-motions for summary judgment that are currently before the Court. (<u>See</u> Docket Item Nos. 23, 26, 28, 29, 51, 52, 55, 57, 60, consolidated cases C 06-01407 and C 06-02202.) With respect to those motions, <u>Rangel</u> Plaintiffs filed a motion entitled: A Request for the Convening of a Three-Judge Court.

On February 6, 2007, the <u>Madrigal</u> Plaintiffs voluntarily dismissed their action against the County, without prejudice. Thus, the only case left in the *In re County of Monterey Initiative Matter* is the <u>Rancho San Juan Opposition Coalition, et al., v. Board of Supervisors of the County of Monterey, et al.</u>, C 06-02369.

4

Before the Court are the following issues to be decided:

1) The <u>Rangel</u> Plaintiffs' motion for the convening of a three-judge panel to hear the motions regarding the Referendum matter.

2) The <u>Rancho</u> Plaintiffs' request to enjoin the County either to repeal Resolution No. 05-305 in its entirety or to submit the Referendum Against Resolution No. 05-305, without alteration, to the voters of Monterey County at the June 5, 2007 county election.

3) The <u>Melendez</u> Plaintiffs' request to remand the case to state court or in the alternative, compel the County to enact the Initiative entitled "The Monterey County Quality of Life, Affordable Housing, and Voter Control Initiative" in its entirely or to submit the Initiative, without alteration, to the voters on Monterey County at the June 5, 2007 county election.

4) The County's request for the Court to dismiss the <u>Melendez</u> case since the controversy has been mooted by a promise to place the Initiative on the June 2007 ballot.

As a preliminary matter, in all four lawsuits, the Defendants are the County of Monterey, Board of Supervisors of the County of Monterey, and Tony Anchundo, in his capacity as Monterey County Registrar of Voters. Suits against an official in her or his official capacity are treated as suits against the entity on whose behalf that official acts. In such suits, the real party in interest is the government on whose behalf that official acts. <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991). Accordingly, on its own motion, the Court dismisses the Board of Supervisors and Tony Anchundo as Defendants, leaving these actions as ones against the County of Monterey.

### III.  DISCUSSION

**A.     The Rangel Plaintiffs' Motion for the Convening of a Three Judge Court**

The <u>Rangel</u> Plaintiffs contend that this case requires a three-judge court pursuant to Section 204 of the Voting Rights Act, 42 U.S.C. § 1973aa-2, which authorizes the Attorney General to

5

institute an action to enforce Section 203.[2] (Plaintiffs Rangel, *Et Al.*, Memorandum of Points and Authorities in Support of Their Request for the Convening of a Three Judge Court at 4, hereafter, "Motion," Docket Item No. 44.) The Rancho Plaintiffs oppose their request, contending (1) there is no authority for an expansive interpretation of Section 204 to cover private actions, given that the statutory language refers only to actions instituted by the Attorney General in the name of the United States and (2) if a three-judge district court is necessary at all, it is required only in the Rangel case, as the Rancho Plaintiffs' suit is based on California law rather than the Voting Rights Act. (Rancho San Juan Opposition Coalition's Opposition to *Rangel* Plaintiffs' Request for the Convening of a Three Judge Court at 2-4, hereafter, "Opposition," Docket Item No. 45.) Since the Rangel Plaintiffs are the only party requesting a three-judge court, and only the Rangel action was filed pursuant to the Voting Rights Act, the Court's analysis concerns only whether the Rangel action necessitates the convening of a three-judge district court.

### 1.   **The Voting Rights Act**

Section 203 of the Voting Rights Act was enacted by Congress to address the effective exclusion of language minorities from participation in the electoral process. 42 U.S.C. § 1973aa-1a. The section bars covered states or political subdivisions from providing voting materials[3] in English only. 42 U.S.C. § 1973aa-1a(b)(1). Covered political subdivisions include those where (1) more than five percent of voting age citizens are limited-English proficient and members of a single language minority and (2) the illiteracy of the citizens in the language minority as a group is higher than the national illiteracy rate. 42 U.S.C. § 1973aa-1a(b)(2)(A).

Section 204 of the Voting Rights Act authorizes the Attorney General to bring suit for equitable relief on behalf of the United States against a state or political subdivision that seeks to deny the right to vote in an election in violation of Section 203. 42 U.S.C. § 1973aa-2. Section 204

---

[2] The County Defendants do not oppose the Rangel Plaintiffs' request for a three-judge court. (See Docket Item No. 46.)

[3] Voting materials include registration or voting notices, forms, instructions, assistance, or other materials or language relating to the electoral process, including ballots. 42 U.S.C. § 1973aa-1a(c).

provides that "[a]n action under this subsection" shall be heard by a court of three judges in accordance with 28 U.S.C. § 2284. Id.

### 2. Three Judge Panel

#### a. Rangel Plaintiffs' Basis for Suit

A seminal question is the jurisdictional basis for the Court to hear the Voting Rights Act component of the Rangel Plaintiffs' action. In their complaint, the Rangel Plaintiffs invoke jurisdiction pursuant to, *inter alia*, 28 U.S.C. § 1343 and 42 U.S.C. § 1973aa-1a (Section 203 of the Voting Rights Act). (Complaint for Declaratory and Injunctive Relief ¶¶ 25-34, Docket Item No. 1.)

Congress granted the district courts exclusive jurisdiction of "any civil action authorized by law" to be commenced by any person "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." 28 U.S.C. § 1343. Thus, the relevant section of the Voting Rights Act must authorize private litigants to secure the relief they seek. See Allen v. State Bd. of Elec., 393 U.S. 544, 554 (1969).

The parties do not cite, nor has the Court found, any case that has explicitly held that a private right of action exists to redress violations of Section 203 of the Voting Rights Act. However, the Ninth Circuit, *en banc*, recently entertained a Section 203 action brought by private plaintiffs, without explicitly stating the jurisdictional basis for the action. See Padilla v. Lever, 463 F.3d 1046 (9th Cir. 2006). Following Padilla, the Court holds that it has jurisdiction to hear a Section 203 action brought by private plaintiffs.

#### b. Section 204 and the Three-Judge Court Requirement

The next issue is whether private plaintiffs have a right to bring suit specifically under Section 204 of the Voting Rights Act.[4] As previously described, Section 204, by its plain terms, authorizes only suits brought by the United States Attorney General. The thrust of the Rangel

---

[4] The Court construes Section 204's requirement of a three-judge court for "[a]n action under this subsection," to refer to actions brought specifically under Section 204. Thus, whether the Rangel Plaintiffs have a statutory right to a three-judge court depends on whether the Rangel action arises under Section 204.

7

Plaintiffs' argument is that they are entitled to a three-judge court by analogy to the Supreme Court's Section 5 jurisprudence in Allen. (Motion at 4-7.)

In Allen, private individuals brought suit alleging that amendments to certain Virginia and Mississippi election laws fell within the purview of Section 5 of the Voting Rights Act. As such, the plaintiffs alleged, the states were required to comply with the Act's approval procedures prior to enforcing the laws.[5] 393 U.S. at 547-49.

The Supreme Court first addressed the threshold question whether private litigants could bring suit under Section 5 of the Voting Rights Act. Id. at 554. Then-Chief Justice Warren, writing for the majority, found that Section 5 of the Act was among a group of federal statutes passed to protect a particular class of citizens. Id. at 557. Though the section did not specifically authorize members of the protected class to initiate suit, the Court held that an implied private right of action existed. Id. To reach this holding, the Court considered the following four factors. First, the Court held that the language of Section 5 that describes an individual right ("no person shall be denied the right to vote for failure to comply . . ."), considered with the major purposes of the Act, supported a private right of action. Id. at 555. Second, the Court noted that Congress had not chosen to explicitly exclude private actions.[6] Id. Third, the Court highlighted the limited nature of the implied private right of action that it had found. Specifically, the only issue in a Section 5 suit brought by a private plaintiff is whether a state must submit new voting legislation for approval. Substantive questions, such whether the state's new legislation actually had a discriminatory purpose or effect,

---

[5] Section 5 of the Act restricts covered states' ability to pass a voting qualification, prerequisite, standard, practice, or procedure different from those in effect on November 1, 1964. Specifically, no person can be deprived of his or her right to vote for failure to comply with the new enactment until the state seeks and receives a declaratory judgment from the United States District Court for the District of Columbia that the new enactment will not deny or abridge the right to vote based on race or color. 42 U.S.C. § 1973c.

[6] The Supreme Court also held that 28 U.S.C. § 1343, in conjunction with Section 12(f) of the Act, 42 U.S.C. § 1973j(f), "might be viewed as authorizing private actions." Section 12(f) provides, "The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of subchapters I-A to I-C of this chapter shall have exhausted any administrative or other remedies that may be provided by law."

8

would not be decided in the private action.[7]  Id. at 555 n.19.  Lastly, the Court found that the broad purposes of the Voting Rights Act could not be fulfilled if the Attorney General had sole discretion whether to institute litigation.  With the Attorney General's "limited staff," he or she might often be unable to uncover quickly the new regulations and enactments passed at the various levels of state government.  Thus, an implied private right of action was necessary to ensure that Section 5's guarantees did not prove an "empty promise."  Id. at 556-57.

Having found that the plaintiffs had an implied private right of action, the Court next considered whether their suit was properly heard by a three-judge district court – that is, whether there was a statutory basis to convene a three-judge court.  Id. at 560-61.  Section 5 provides, "Any action under this section shall be heard and determined by a court of three judges . . ."  42 U.S.C. § 1973c (emphasis added).  Under the Court's interpretation, three types of Section 5 suits were possible: (1) a suit brought by the State for a declaratory judgment; (2) a suit brought by an individual for a declaratory judgment and injunctive relief, claiming that the state legislation subject to Section 5 must be submitted for federal scrutiny; and (3) a suit for injunctive relief brought by the Attorney General to prohibit the enforcement of a new regulation because of the state's failure to obtain Section 5 approval.  Id. at 561.  The Court held that all of these suits were brought "under" Section 5 a; the Court held separately that the words "under this section" authorized a three-judge court in all three types of cases.  Id.

The Court considered reasons against extending the three-judge court requirement beyond the plain language of Section 5.  Id.  First, convening a three-judge court burdens the federal system and often delays matters requiring swift adjudication.  Second, the decisions of three-judge district courts are directly appealable to the Supreme Court, which deprives the Supreme Court of the "wise and often crucial adjudication" of the intermediate appellate courts.  Id. at 561-62.  Accordingly,

---

[7] For the same reason, the Court held that Section 14(b)'s requirement that actions be brought in the District Court for the District of Columbia applied only to actions brought by the government.  Private litigants could bring "coverage" litigation in any proper federal district court pursuant to Section 12 of the Act and 28 U.S.C. § 1343(4).  Id. at 557-560.

congressional enactments providing for the convening of three-judge courts are strictly construed. Id. (citing Phillips v. United States, 312 U.S. 246 (1941)).

On the other hand, the Court acknowledged that Congress had legitimate reasons for adopting three-judge court legislation. Id. Congress has determined that three-judge courts are desirable in particular circumstances involving confrontations between federal and state power or in circumstances involving a potential for substantial interference with government administration. Id. at 562. Specifically with respect to Section 5, the Supreme Court held:

> The problems [of federal supervision over the enforcement of state legislation] are especially difficult where the enforcement of state enactments may be enjoined and state election procedures suspended because the state has failed to comply with a federal approval procedure . . . In drafting § 5, Congress apparently concluded that if the governing authorities of a State differ with the Attorney General of the United States concerning the purpose or effect of a change in voting procedures, it is inappropriate to have that difference resolved by a single district judge. The clash between federal and state power and the potential disruption to state government are apparent.

Id. The Court found that there exists "no less a clash and potential for disruption" when the issue is whether a state enactment is subject to Section 5. Id. Accordingly, given the "extraordinary nature of the Act in general, and the unique approval requirements of § 5," Congress intended that all disputes involving Section 5 coverage be determined by a district court of three judges. Id.

There are several substantive differences between Allen and this Section 203 action brought by private litigants. First, the Supreme Court made explicit the source of the statutory authority to hear a Section 5 action brought by a private plaintiff: Section 5 itself, the same section that provided for a three-judge court. In contrast, no federal court has held that the statutory authority to hear a Section 203 action brought by a private plaintiff is Section 204. Second, the extent of the confrontation between federal and state power is much less in a Section 203 case than in a Section 5 case. Section 5 regulates covered states' ability to adjust their voting procedures, a substantial intrusion on state sovereignty. In contrast, a Section 203 action only requires that the covered state make voting materials available in languages other than English. Thus, the policy reasons that existed in Allen for finding a statutory right to a three-judge court do not exist here.

10

On the other hand, the policies against convening a three-judge court identified by the Supreme Court in Allen are applicable here. A three-judge court would delay the resolution of this dispute. Additionally, the appeal from decision of a three-judge district court is directly to the Supreme Court. See 28 U.S.C. § 1253. Accordingly, as noted disapprovingly by the Allen Court, the Supreme Court would be deprived of the benefit of the Ninth Circuit's adjudication in this case.

The Court finds that the Rangel Plaintiffs' suit does not arise under Section 204 of the Voting Rights Act. Accordingly, the Rangel Plaintiffs are not entitled to litigate this case before a three-judge court.

**B.  Cross-motions for Summary Judgment**

    **1.  *In re Monterey Referendum***

The controversy in this consolidated case is purely a legal dispute, namely, is there sufficient legal similarity between a recall petition and a referendum petition that Padilla is controlling authority? The Court evaluates the Referendum process to determine whether there is any meaningful distinction between that process and the recall process addressed by Padilla.

        **a.  The Referendum Process in California**

The constitutional referendum power is the right reserved to the people to approve or reject statutes or parts of statutes that have been enacted by a legislative body. Cal. Const., art. II, sec. 9(a). The procedures governing introduction and passage of a referendum against a City or County ordinance are set forth in Cal. Elec. Code sections 9235-9247 and 9140-9147, respectively.

To initiate the referendum process, the opponent of the ordinance must:

1)     First circulate a petition and obtain the requisite number of voter signatures to qualify the petition. See generally, Cal. Elec. Code § 9237.

11

  2)  Each referendum petition must contain a caption at the top of each page stating "Referendum Against an Ordinance Passed by the City Council."[8] Id. at §§ 9238 (a) and 9147(a).

  3)  Each section of the petition must provide a) the identifying number or title of the ordinance, b) relevant text of the ordinance being challenged, and c) petitions challenging a City ordinance must additionally attach a declaration of the petition circulator stating his or her residence address at the time of the execution of the declaration and qualification to register as a voter of the City. Id. at § 9238 (b), (c) and 9147(b).

If the opponent of the statute gathers the requisite number of signatures, he or she must file a signed petition with the relevant City or County within 30 days after adoption, but before the ordinance goes into effect. Cal. Elec. Code §§ 9242 and 9144. City and County ordinances become effective 30 days after adoption. Id. at §§ 9235 and 9141(b). If a referendum petition is submitted within 30 days of the adoption of the challenged ordinance, then the "effective date of the ordinance [is] suspended and the legislative body [is required] to reconsider the ordinance." Id. at §§ 9237 and 9144.

Following the filing of a petition challenging a city ordinance, the City must examine sufficiency of the petition, validity of signatures, and all the other procedural requirements as set forth in Cal. Elec. Code sections 9114-15, 9210, 100, 104, and 105. The City is then required to certify that a sufficient number of valid signatures have been obtained. Cal. Elec. Code § 9239-40. If the petition is challenging a County ordinance, the County is required to review the petition to ensure that it complies with all of the procedural requirements set out in Cal. Elec. Code § 9100 et seq., which are the same as the requirements for an initiative petition. Id. at § 9146. Following this examination, the City Council or Board of Board of Supervisors has two options. First, the City

---

[8] For petitions opposing a County ordinance, the heading must read "Referendum Against an Ordinance Passed by the Board of Supervisors. Cal. Elec. Code § 9147(a).

12

Council or Board of Supervisors may repeal the ordinance against which the petition is filed without submitting it to the public vote. Id. at §§ 9241 and 9145. Alternatively, the Council may submit the matter to a vote of the public at either a general or special election. Id.

### b. Padilla v. Lever

The *en banc* Padilla decision primarily focused on whether the recall petitions circulated by the proponents of the recall were subject to Section 203 because they were "provided" by the county. 463 F.3d at 1050.

Section 203 of the Voting Rights Act is codified at 42 U.S.C. § 1973aa-1a. Section 203 provides:

> Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language.

42 U.S.C. § 1973aa-1a(c).

The Padilla Court held that regulatory processes do not transform petitions *"privately initiated*, *drafted*, and *circulated* by the proponents into petitions 'provided' by the County for purposes of the Voting Rights Act." Id. at 1051. (emphasis added.) From this, the Court derives that a petition is not provided by the County if it is 1) privately initiated, 2) drafted, and 3) circulated by proponents of the petitions.

The County does not dispute that the Referendum petition was privately initiated and circulated by certain citizens in the County of Monterey. The County contends, however, that the County has an integral role in the Referendum process and that the content of the Referendum is essentially drafted by the government.

First, among the regulatory processes, the County contends that the government plays an integral role to ensure that a referendum petition conforms to the statutory requirements. They are:

(1) The Code has specific requirements as to the information required of petition signers;

(2) There are time limits on when the petition may be filed;

13

(3) The local elections officer must examine and verify the number of valid signatures on the petition, and is provided with detailed direction on how to do so.

(4) The Registrar is required to forward the measure to the County Counsel for preparation of an impartial analysis of the measure and its effect on existing law, and if necessary the county auditor may be required for a similar analysis of the fiscal effect of the ordinance.

(5) The County actually supplies the text that is before the signers of the petition.

The Court finds that the first two steps described by the County are regulatory in nature. The *en banc* opinion explains:

> It is true that California regulates recall petitions in some detail. The petitions must follow a format provided by the Secretary of State, and must use a minimum type size. [internal citations.] The petition also must include a copy of the Notice of Intention, the statement of grounds for recall, and the answer of the targeted officer if the officer submitted one. [internal citations.] But these regulations do not mean that the petitions are *provided* by the State or subdivision. The form is regulated by the State, but the proponents fill out the petition, supply the grounds of recall, and have the petitions printed at their own expense. The fact that, under Cal. Elec. Code § 1104(a), the Secretary of State "provides" the format does not mean that the State "provides" the petitions themselves within the meaning of the Voting Rights Act.

Padilla, 463 F.3d at 1051. (emphasis in the original.)

Second, the fact that election officials must later verify the signatures on the petition or that the County Counsel prepares a separate analysis of the Referendum is not dispositive. The word "provides" connotes that the involvement by the County must occur before the petition is circulated. As described by the County, the Referendum petition does not get submitted to the election officials or the County Counsel for review until after it has been circulated. The Counsel report does not become part of the Referendum, but rather is an advisory report submitted to the Board of Supervisors to weigh the impact on existing law. While this precise issue was not addressed in Padilla, the Court finds that because it occurs after the petition has already been circulated for signatures, it falls into the "regulatory process."

Finally, the County contends that the government drafts the Referendum, because the code requires that the text of the ordinance being challenged be replicated in the petition itself. While this

14

issue was not precisely addressed by Padilla, that Court addressed a similar problem.  The plaintiffs in Padilla argued that "because the election officials are charged under state law with ascertaining whether proposed form and *wording* of the petition meets the requirements of the [election code] [internal citations], they are dictating the content of the petitions to the degree that the petitions may be said to be 'provided' by the county."  460 F.3d at 1051.  (emphasis in original.)  With respect to the "wording" requirement, the *en banc* Court explained:

> But there is nothing in the chapter governing elections that specifies the actual wording that proponents must use, for example, in stating their grounds for recall.  Nor does the record contain any hint that the election officials determine the contents of the petition; they merely make sure that the petitions are in the form specified by statute.  It is not reasonable to hold that this regulatory process transforms petitions privately initiated, drafted, and circulated by the proponents into petitions "provided" by the County for the purposes of the Voting Rights Act.

Id.

The Court finds that the County has misconstrued the phrase "actual wording" described in the above text.  While it is true that the code requires proponents to copy of exact text of the ordinance being challenged, the purpose of this requirement to inform the signers of the ordinance being challenged.  To the extent that the County provided "actual wording," it provided the language of the ordinance that is the subject of the Referendum.  It does not follow from inclusion of the ordinance that the County is providing the Referendum petition itself.

The Court finds that the Referendum at issue was privately initiated, drafted, and circulated by its proponents and thus, is not subject to the dual-language requirement of Section 203 of the Voting Rights Act.

### 2. *In re County of Monterey Initiative Matter*

In this consolidated action, Rosario Madrigal, et al., v. County of Monterey, et al., C 06-01407, has been dismissed without prejudice pursuant to the Stipulation for Voluntary Dismissal.  (See Docket Item No. 47.)  In the remaining case, William Melendez, et al., v. Board of Supervisors of the County of Monterey, et al., C 06-1730, the Melendez Plaintiffs contend that because County has agreed to submit the Initiative to a vote of the County electorate at the June 5, 2007 election, there is no longer a basis for federal jurisdiction.  The Melendez Plaintiffs seek a remand to the state

15

court, or in the alternative seek (1) a declaration that the County violated its duties under the California Constitution and the California Elections Code by refusing either to adopt the Initiative without alteration or to submit it to a vote of the people; (2) an injunction requiring the County either to adopt the Initiative without alteration, or to submit the Initiative to the voters of the County at the next county election.

The Court finds that bifurcation of the federal and state law issues is judicially inefficient. The remedies prayed for in the Melendez Plaintiffs' state court Complaint do not differ from the remedies the Court will provide, namely, injunctive relief. There is no longer an objection by the Madrigal Plaintiffs that the Initiative violates Section 203. The County has represented in its papers that it will place the Initiative on the June 2007 ballot. Accordingly, the Court GRANTS the Melendez Plaintiffs an injunction requiring the County to submit the Initiative, without alteration, to the voters of the County at the June 5, 2007 county election.

### IV.  CONCLUSION

The Court DENIES the Rangel Plaintiffs' Request for the Convening of a Three-Judge Court in the *In re Monterey Referendum* case. The Court GRANTS the Melendez and Rancho Plaintiffs' motions for summary judgment and ORDERS as follows: The County of Monterey shall submit (1) the Monterey County Quality of Life, Affordable Housing, and Voter Control Initiative and (2) the Referendum Against Resolution No. 05-305, in their entirety and without alteration, to the voters of Monterey County at the June 5, 2007 county election.

Dated:  March 29, 2007

JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Ciaran O'Sullivan cosullivan@nossaman.com
Fredric D. Woocher fwoocher@strumwooch.com
Joaquin Guadalupe Avila avilaj@seattleu.edu
Leroy W. Blankenship blankenshipl@co.monterey.ca.us
Michael J. Strumwasser mstrumwasser@strumwooch.com
Stephen N. Roberts sroberts@nossaman.com

Dated: March 29, 2007                    Richard W. Wieking, Clerk


                                         By:   /s/ JW Chambers
                                              Elizabeth Garcia
                                              Courtroom Deputy